Hubert W. VOGT, Plaintiff-Respondent and Co-Appellant,

v.

Douglas J. SCHROEDER, Progressive Casualty Insurance Company, a foreign insurance corporation, Defendants-Appellants,

WISCONSIN EMPLOYERS CASUALTY COMPANY, a domestic insurance corporation, Defendant-Respondent.

Supreme Court

*No. 84–1117. Argued October 28, 1985.—Decided April 2, 1986.*

(Also reported in 383 N.W.2d 876.)

3

For the defendants-appellants there were briefs by *Jeffrey A. Schmeckpeper, Patti J. Kurth* and *Kasdorf, Dall, Lewis & Swietlik, S.C.,* Milwaukee, and oral argument by *Mr. Schmeckpeper.*

For the plaintiff-respondent and co-appellant there was oral argument by *Phillip J. Eckert,* West Bend.

For the defendant-respondent there was a brief by *Robert L. Elliott* and *Cook & Franke, S.C.,* Milwaukee, and oral argument by *Mr. Elliott.*

HEFFERNAN, CHIEF JUSTICE. This is an appeal from an order of the circuit court for Washington county accepted by this court upon the certification of the court of appeals.

The question in this case is whether an underinsurer has a right of subrogation against an underinsured tortfeasor when the underinsurer makes a partial payment of its insured's damages. We conclude that it has the right of subrogation; and therefore, with modification, we affirm the circuit court order.

The issue arises out of the following facts. The plaintiff, Hubert W. Vogt (the insured), a passenger in his own automobile, was injured when the vehicle, driven by his son, collided with a vehicle driven by the defendant, Douglas J. Schroeder. The case is in a pretrial stage, but it is implicit that Schroeder was primarily, perhaps wholly, liable, because it is conceded, for this appeal at least, that his vehicle invaded the lane of the Vogt vehicle when the collision occurred.

The Schroeder vehicle carried only a $15,000 liability coverage, and it is agreed that the personal injury damages sustained by Vogt exceed $15,000. There is nothing in the record to show the total amount of damages to which Vogt may be entitled.

The Vogt vehicle, in addition to the usual liability coverages, was covered by an underinsured motorist rider for a maximum sum of $50,000. The coverages on the Vogt automobile are afforded by a policy with Wisconsin Employers Casualty Company (WECC). The liability coverage on the Schroeder vehicle is afforded by

7

a policy issued by Progressive Casualty Insurance Company.[1]

Because the liability prediction in respect to Schroeder is highly unfavorable, Progressive has offered to pay its policy limits of $15,000 in exchange for its release and the release of tortfeasor Schroeder, its insured.

Inasmuch as Vogt has sustained serious injuries, it is apparent that some compensation will be afforded under his underinsured policy. Thus, although WECC does not object to the settlement in the sum of $15,000 offered by Progressive, it has refused to approve of the settlement unless it can be accomplished without impairing WECC's possible right of subrogation against the tortfeasor Schroeder.

The recitals contained in Vogt's WECC policy describe the nature and purpose of underinsured motorist coverage[2] and also provide limitations on the insured's ability to settle with an underinsured motorist.

WECC's policy provides:

"We will pay damages for bodily injury which an insured person is legally entitled to recover from

---

[1] It should be noted that, because Vogt was a passenger in his own automobile, WECC could be liable for any negligence of the driver, Vogt's son. However, the possibility that WECC may eventually contribute as a liability insurer is not a factor that need be considered in the present posture of the case.

[2] Hentemann, *Underinsured Motorist Coverage; A New Coverage With New Problems,* Insurance Counsel Journal 365–66 (July 1983), contrasts the purposes of uninsured coverage and underinsured coverage:

"Uninsured motorist coverage protects against the financially irresponsible motorist; underinsured motorist coverage protects against the inadequately insured motorist."

the owner or operator of an uninsured motor vehicle . . . or an under-insured motor vehicle."

The policy defines an underinsured motor vehicle as:

"[A] motor vehicle which is insured by a liability bond or policy at the time of the accident which provides bodily injury liability limits less than the limit of liability for this coverage."

The settlement limitations appear in the WECC policy as a portion of its general provisions:

"In the event of any payment under this policy, we are entitled to all the rights of recovery of the person to whom payment was made against another. That person must sign and deliver to us any legal papers relating to that recovery, do whatever else is necessary to help us exercise those rights and do nothing after loss to prejudice our rights.

"When a person has been paid damages by us under this policy and also recovers from another, the amount recovered from the other shall be held by that person in trust for us and reimbursed to us to the extent of our payment."

When WECC was informed of Progressive's settlement offer, it responded to Vogt's attorney by referring to the above provisions of Vogt's policy and stating:

"We can only cite the policy language and let you determine if our rights have been prejudiced should you acquire a full and final release. Certainly, we have no objection to your consummating a settlement, provided our rights to subrogation are not prejudiced."[3]

---

[3] At the time of WECC's correspondence in respect to the

As the result of WECC's response, Vogt commenced an action against Schroeder. Subsequently, as a part of that underlying action, Progressive Casualty Insurance Company and Schroeder filed a motion for a declaration of the right of Progressive to pay the policy limits to Vogt and the right of Vogt to release Schroeder and Progressive from any further liability. They also asked for a declaration that Vogt's rights under his own policy would not be prejudiced by reason of giving those releases.[4]

Progressive and Schroeder also asked that, in the event such releases were authorized and policy limits paid, they be dismissed as defendants in the action brought by Vogt.

Circuit Judge J. Tom Merriam stated the question:

"[C]an the insured [of an underinsured motorist's policy] settle with the tort feasor, and receive additional payments from the under-insured motorist's carrier and prevent the underinsured motorist's carrier from exercising subrogation rights of reimbursement against the tort feasor?"

---

$15,000 settlement, no reference was made to the portion of the WECC policy providing:

"*Exclusions* Coverages under this Part do not apply to bodily injury sustained by a person:

"(1) . . .

"(2) If that person or the legal representative of that person makes a settlement without our written consent."

WECC continues to assert that it has no objection to the settlement—only that the settlement shall not be to the prejudice of that company's subrogation rights.

[4] The reason for this requested declaration (see n. 3) is that, under the policy, conduct by an insured prejudicing the rights of the insurer can void coverage.

10

The circuit court order deciding the motion held that:

"[Vogt] can accept the $15,000.00 . . . offer by the Progressive Casualty Insurance Company with the understanding that the same would be accepted without prejudice to Wisconsin Employers Casualty Company maintaining its subrogated rights against the defendant, Schroeder. . . ."

It is from this nonfinal order that Progressive has appealed. Leave to file the appeal was granted by the court of appeals, whose certification this court subsequently accepted.

Although Progressive was the partial victor on the motion in that it was decided that Vogt could accept that company's $15,000, nevertheless it was explicit that WECC had the right of subrogation against the defendant Schroeder. Hence, the payment of $15,000 under the circuit court's formulation did not release Progressive's insured. Because Progressive's basic position is that no underinsurer can ever have any subrogation rights, appeal was taken.

The appellant's argument rests upon the single premise that "[S]ubrogation exists for the sole purpose of preventing double recovery." Language used by this court in both *Garrity v. Rural Mutual Insurance Co.,* 77 Wis. 2d 537, 253 N.W. 2d 512 (1977), and *Rimes v. State Farm Mutual Automobile Insurance Co.,* 106 Wis. 2d 263, 272, 316 N.W. 2d 348 (1982), gives superficial support to this proposition. *Garrity* states:

"Thus it has been held that the conventionally subrogated or contractual insurer has no share in the recovery from the tort-feasor if the total amount recovered by the insured from the insurer does not cover his loss." At 544.

11

*Rimes* states:

> "The purpose of subrogation is to prevent a double recovery by the insured. Under circumstances where an insured has received full damages from the tortfeasor and has also been paid for a portion of those damages by the insurer, he receives double payment—he has been made more than whole. Only under those circumstances is the insurer, *under principles of equity* entitled to subrogation." (Emphasis supplied.) At 272.

Progressive argues the order should have provided that WECC could not recover in subrogation because, by the very coverage, its insured could not be made more than whole. Progressive reasons that an underinsurer is a last resort payee and, under its policy, after other insurance payments, will pay its insured only enough to fully compensate its insured for damages, *i.e.,* its responsibility stops at one hundred percent, and in the event other sources, including the tortfeasor's insurance policy, fully compensate the insured, then the underinsurer pays nothing. Progressive asserts there can be no triggering of the *Garrity-Rimes* principle of subrogation that seeks to prevent a double recovery.

This argument has a surface plausibility, but it overlooks the fact that subrogation is an equitable doctrine and depends upon a just resolution of a dispute under a particular set of facts. 6A Appleman, *Insurance Law and Practice,* sec. 4051, p. 110. Equity does not lend itself to the application of black letter rules. Hence, only under fact situations where an equitable result will follow should the statements quoted above be applied literally.

12

Both *Garrity* and *Rimes* rest upon equitable principles. Both eschewed universal answers to disparate situations. *Garrity* stated:

> "Subrogation rests upon the *equitable* principle that one, other than a volunteer, who pays for the wrong of another should be permitted to look to the wrongdoer to the extent he has paid and be subject to the defenses of the wrongdoer." (Emphasis supplied.) At 541.

Accordingly, *Garrity* recognizes that there are equitable principles to support subrogation other than those concerned with whether the injured or indemnified party is made whole or unjustly enriched. There is a distinct and separate equitable policy—that the wrongdoer should be responsible for his conduct and not be allowed to go scot-free by failing to respond in damages while another, an indemnitor for the injured party, is required to do so.

In *Rimes,* also, at 271, we stated, "[T]he entire law of subrogation is based upon *equitable principles.*" (Emphasis supplied.)

Both *Garrity* and *Rimes* rest upon the application of equitable principles to a particular set of circumstances. The circumstances in each of those cases were substantially the same, and therefore the subrogation problem posed in each was subject to resolution by applying the same equitable principle to the facts—that the insured had a right to be made whole, but no more than whole. Hence, the insurer was to be subrogated only if further recovery would do more than make the insured whole. It was considered that this was equitable, for, in each case, the obligation under the insurance policy was to pay the damages sustained (fire loss

13

in one case, medical payment in the other) even in circumstances where there was no tortfeasor from whom collection could be had by either the insured or the insurer.

The principle used to deny subrogation against the insured in each case was stated negatively in *Rimes:*

> "Only if the insured's tort damages make him whole is he required to *disgorge* the amounts by which he has been [over]indemnified." (Emphasis supplied.) At 276.

We said:

> "[T]he insured cannot collect once in indemnity from the indemnitor and again in damages from the tortfeasor without being compelled to respond in subrogation." At 276.

Because in both *Garrity* and *Rimes* the court knew from the record that the funds available were insufficient to satisfy the damages of the injured party—*i.e.,* to make him whole, we refused, in equity, to allow the insurer to take, in subrogation, funds from the tortfeasor that would, in the absence of subrogation, have gone toward the satisfaction of insured's damages. In both *Garrity* and *Rimes,* this court was presented with the inequitable prospect of insurance companies attempting to take the funds that should have gone to the insured. The effect of allowing such subrogation would have been to reduce the insured's recovery to an amount that would not have made him whole, despite the fact the insurance company had received premiums to cover a loss incurred.

In *Garrity,* the fight was between an insured and his own insurer for *priority* in claiming the $25,000 from the tortfeasor's insurer, when the insured had not

been fully compensated for the fire loss by payment made by his own insurer. Equity as well as common sense led inevitably to the conclusion that priority was to be afforded to the insured who had not been made whole.

In *Rimes,* too, the question was one of priority. It was determined that to fully compensate the plaintiff would require more than $300,000. A settlement obtained on behalf of the plaintiff would have yielded only $125,000,[5] including some $9,000 resulting from medical payments for which State Farm claimed subrogation. We held that, as between the insurer, who had been paid a premium for its coverage of the risk, and its insured, who was more than $175,000 short of being fully compensated, simple principles of equity and justice which govern subrogation mandated that the insurance company not recover at the expense of its own insured.

The teaching of *Garrity* and *Rimes* is not the simplistic rule that is urged by Progressive to be of universal application in all subrogation cases. Rather, it is that subrogation depends upon the application of equitable principles to the facts of the case. *Garrity* and *Rimes,* although involving different types of insurance, were basically the same case—who was to have priority, the insured or the insurer, where the total payments, including possible subrogation recovery, still would not make the insured whole.

The question here is a different one: Whether an automobile insurer which by the terms of its contract

---

[5] State Farm, the insurer in *Rimes,* did not argue that the settlement figure was inappropriate. In fact, it joined in the settlement.

pays its own insured under the underinsured motorist coverage has a right of subrogation against the tortfeasor (the underinsured motorist) once a payment has been made to its own insured.

We believe that the Minnesota Supreme Court in *Schmidt v. Clothier,* 338 N.W. 2d 256 (Minn. 1983), correctly addressed substantially that problem and distinguished it from the *Garrity-Rimes* scenario. The court stated:

"Respondents and the Trial Lawyers amicus take the position that subrogation rights for underinsurance benefits will never arise in the context of settlement. They argue that subrogation rights exist only when the injured person has been fully compensated and only to the extent necessary to prevent double recovery by the insured. *Id.* Since the underinsurer is in a position to prevent double recovery, they claim, subrogation will never arise when its insured settles with an underinsured tortfeasor.

"Subrogation rights depend on 'general principles of equity and the nature of the contract of insurance.' *Bacich v. Homeland Insurance Co.,* 212 Minn. at 376, 3 N.W. 2d at 665. In *Kluver,* the insurer was attempting to recoup benefits it had paid by obtaining the proceeds of a settlement reached by its insured with two liquor vendors who had sold liquor to the uninsured tortfeasor. We held that the insured was entitled to retain the settlement proceeds because the insurance benefits and the settlement amount together did not fully compensate her for her injuries. In that case, the equities to be balanced, the insurer's right to recoup benefits paid and the injured person's right to obtain full compensation, weighed in favor of our public policy favoring full compensation of injured persons. Clearly,

16

in the cases before us, under the rule of *Kluver,* the underinsurer would not be able to recover underinsurance benefits from settlements obtained by its insured from liability defendants because, by definition, the injured person has not been fully compensated." At 262.

The Minnesota court goes on to state, however, that, in the underinsured situation posed in *Schmidt,* the balancing of equities is not between the insurer and its own insured but between the underinsurer and the tortfeasor. The court states:

> "In the situation before us, the equities to be balanced are those between the underinsurer, which has paid benefits, and the underinsured tortfeasor, who has not paid for the damages he or she has caused. Between these two parties, the equities balance in favor of the underinsurer." At 262.

We conclude, as did the Minnesota Supreme Court, that the underinsurer, in this case WECC, has the right of subrogation against the tortfeasor and his insurer to the extent that the underinsurer has paid benefits to its own insured, Vogt, prior to the release of tortfeasor Schroeder and his insurance company, Progressive.[6]

Looking at the question from the viewpoint of a motorist who is injured by an underinsured tortfeasor, it would appear only just that a motorist who carries underinsured coverage should not be worse off than if

---

[6] "The general rule is that an insurer, on paying a loss, is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss." 6A Appleman, *Insurance Law and Practice,* sec. 4051, p. 103.

he were injured by a fully insured motorist. Such motorist ought to be able to "settle" with the tortfeasor's insurance company to the extent of that tortfeasor's coverage. The motorist should not be required to sue for what is being offered and thus incur larger fees and expenses just to accommodate the underinsurance company's desire to protect its subrogation rights. At least the motorist should not be obligated to do so if it is possible, under the terms of the contract and in justice, for the injured party to receive the settlement proceeds, or its equivalent, and the underinsurer is still able to protect its subrogation rights.

If we assume that the negligent defendant had carried $50,000 insurance and the plaintiff's damages equalled that amount, plaintiff would be able to recover $50,000. If the defendant were wholly uninsured and the plaintiff carried uninsured motorist coverage of $50,000, he should be able to be compensated $50,000, the amount of the uninsured coverage. If, as here, the defendant had partial coverage, $15,000, and the plaintiff had *under*insured motorist's coverage of $50,000, it would be contrary to public policy to permit the plaintiff to be compensated less than in the other two cases. It seems clear that his recovery should be $50,000, at a minimum, and that if $15,000 is to be paid by the defendant's policy, the plaintiff should be compensated by his own underinsurance carrier in an amount, not exceeding coverage limits, sufficient together with the payment from the tortfeasor's liability coverage to equal the sum of $50,000.[7]

---

[7] While it was asserted in oral argument that the protection afforded by underinsured coverage was in each case to be reduced by the amount of liability coverage carried by the underinsured motorist, we see no policy provision that so provides. It would not ap-

■

We conclude that, in the instant case, if the underinsurer WECC has paid the sum of at least $15,000 to its insured, Vogt, equivalent to the maximum amount obtainable from Schroeder's insurance company, it may after such payment assert a claim against Schroeder's insurer in that amount. This comports with the policy provision, "In the event of any payment under this policy, we [WECC] are entitled to all the rights of recovery of the person to whom payment was made against another," and also comports with generally accepted equitable subrogation principles. *Appleman, supra,* sec. 4051.

■

As this policy provision makes clear, a subrogation claim may not be pursued until payment has been made by the underinsured carrier; nor can subrogation be asserted after the tortfeasor has been released. Thus, in order to accomplish a just result, to put the burden of final payment upon the tortfeasor for the amount in excess of his coverage and to give the insured the proceeds of the settlement offered by the underinsured's insurer without the necessity of a costly lawsuit, it is necessary for the underinsurer to make

pear that a reduction of "any amount payable" by reason of the payment by another person liable effects a limitation of the potential liability under any coverage. It would appear, rather, that the amount payable reduction merely prevents a duplication of a payment made by another. This question was not placed in issue on this appeal. Accordingly, the question remains an open one insofar as this court is concerned.

payment to its own insured without releasing the tort-feasor.[8]

The Minnesota court has approved a procedure to accomplish that.

In *Schmidt, supra* at 263, after pointing out that the question of priority between an insurer and its own insured posed a different equitable problem than the question of subrogation by an underinsurer against a tortfeasor when the underinsurer was required to indemnify its insured for the wrongdoing of the tortfeasor, the Minnesota court stated:

> "The underinsurer, however, will have this subrogation right against the tortfeasor only if it has paid underinsurance benefits prior to release of the tortfeasor. Thus, the underinsurer is entitled to notice of the tentative settlement and an opportunity to protect those potential rights by paying underinsurance benefits before release. The district court in each of the cases before us provided just this opportunity. Under the procedure set out in those orders, the underinsurer was given notice of the tentative settlement agreement and a period of time in which to assess the case. In that time it could evaluate relevant factors, such as the amount of the settlement, the amount of liability insurance remaining, if any, the amount of assets held by the tortfeasor and the likelihood of their recovery via subrogation, the total amount of the insured's damages, and the expenses and risks of litigating the insured's cause of action. If the underinsurer were to determine after assessment that recovery of underinsurance benefits it paid was unlikely (e.g., where the liability limits are exhausted or nearly

---

[8] Of course, the underinsurer's obligation will never exceed the amount agreed upon as underinsurance coverage in the policy.

20

so and the tortfeasor is judgment-proof), it could simply let the 'grace period' expire and permit the settlement and release. It must, of course, thereafter process the underinsurance claim but would not be able to recover those payments through subrogation. *Great Northern Oil Co. v. St. Paul Fire & Marine Insurance Co.*, 291 Minn. 97, 189 N.W. 2d 404.

"If, on the other hand, damages were substantially more than the liability limits and the tortfeasor had substantial assets, the underinsurer could substitute its payment to the insured in an amount equal to the tentative settlement. In this situation, the underinsurer's payment would protect its subrogation rights to the extent of the payment, and the insured would receive the amount of the settlement offer in cash. The underinsurer would then have to arbitrate the underinsured claim and could, thereafter, attempt to negotiate a better settlement or could proceed to trial in the insured's name. We note again that prompt assessment, arbitration, and payment of underinsurance claims will protect the underinsurer's subrogation rights, and the underinsurer will avoid having to choose later between either acquiescing in the settlement or substituting its check for the amount of the settlement offer." At 263.

In effect, this procedure gives to the plaintiff's underinsurer the option of rejecting the settlement offer to prevent the release of the tortfeasor and thus protect its right of subrogation, but it may not thwart the right of its own insured to receive some payment, either the amount of the insured's underinsurance claim or the amount offered in settlement. The price of protecting its subrogation right is payment to its own insured in the sum offered by the tortfeasor's insurance com-

pany,[9] but not exceeding the coverage afforded by the underinsured motorist provision.

In *Schmidt,* the plaintiff's damages exceeded $265,000. The defendant was protected by a $100,000 liability policy, and the plaintiff was protected by a Safeco's underinsured motorist policy in the sum of $100,000. Defendant's liability insurer, St. Paul Fire and Marine Insurance Co., offered to settle for its policy limits of $100,000. Plaintiff notified her underinsurer, Safeco, of her intention to settle for that amount. Safeco, in the same position as WECC in the instant case, refused to agree unconditionally to the settlement because it felt its subrogation interest would be jeopardized.

Safeco, however, then tendered its check for $100,000, the amount of its underinsured liability exposure and asked the Minnesota district court that it be released from further obligation, and also asked that any sum otherwise received by the plaintiff from the tortfeasor or his insurer be held in trust for a possible recovery in subrogation. After the trial court authorized the plaintiff to settle by accepting $100,000 from the tortfeasor's insurer and gave the underinsurer ten days[10] to pay the policy limits of the underinsurance, the underinsurer appealed.

In a case subsequent to *Schmidt, supra,* the Minnesota court summarized the general rule:

[9] Of course, by preserving its subrogation rights, it would have recourse against the tortfeasor for any amount it paid its own insured because of the tortfeasor's action.

[10] The Minnesota Supreme Court in *Schmidt* stated that ten days was too short a time for a determination to be made and stated that "30 days from the written notice of the tentative settlement agreement is a more reasonable time period." At 263.

"The general rule is that a settlement and release of an underinsured tortfeasor will not automatically preclude recovery of underinsurance benefits. *Schmidt v. Clothier,* 338 N.W. 2d 256, 262 (Minn. 1983). When an insured party has given his underinsurance carrier notice of a tentative settlement prior to release, and the insurance carrier has the opportunity to protect its subrogation rights by paying the underinsurance benefits before the release, the release will not preclude recovery of underinsurance benefits [by subrogation]. *Schmidt,* 338 N.W. 2d at 263. If the tortfeasor is released before the insurance carrier makes payment to its insured, however, subrogation rights do not arise. *Schmidt,* 338 N.W. 2d at 262." *Progressive Casualty Insurance Co. v. Kraayenbrink,* 370 N.W. 2d 455, 460 (Ct. App., Minn. 1985).[11]

■

It would appear that the procedure utilized by the Minnesota court, or a similar procedure to be fashioned by a court, would resolve the dilemma posed by the present case and avoid the inequity presented in this case of having a substantially blameless insured go uncompensated for a period of over four years. There may be some slight delay of payment to the insured while the underinsurer evaluates and arbitrates the underinsurance claim. The delay is justified, however, because, at the end of the period, the insured will receive the amount due under its policy. The plaintiff can take advantage of the settlement offer of the defendant's insurance company, and the underinsurer can protect its subrogation rights. If the underinsurer concludes that

---

[11] Progressive Casualty Insurance Company, the party to the Minnesota case cited, is the appellant in the instant case.

subrogation is worthless, it can terminate its involvement in the action by acquiescing in the settlement.

Exactly how in the instant case the trial judge contemplated, procedurally, that the rights of subrogation would be preserved by his order is not apparent from the record. No "order" from which the appeal was taken is to be found in the record before us. Nevertheless, the court of appeals and the parties treated the memorandum opinion of Judge J. Tom Merriam as an order of the circuit court for Washington county. While this procedure does not comport with appropriate appellate practice, we will not at this point, because the power of the court of appeals to accept a nonfinal order is discretionary (sec. 808.03, Stats.), hold that neither this court nor the court of appeals had jurisdiction.

In conformity with what appears to be the intent of the parties and the perception of the court of appeals when it accepted this case on appeal, we construe the last paragraph of Judge Merriam's memorandum decision of May 22, 1984, to be the order from which the appeal is taken. It provides:

> "It is concluded that the plaintiff can accept the $15,000.00 policy limits offer by the Progressive Casualty Insurance Company with the understanding that the same would be accepted without prejudice to Wisconsin Employers Casualty Company maintaining its subrogated rights against the defendant, Schroeder, in the event Wisconsin Employers is called upon to make payment to the plaintiff, Vogt, under the under-insured motor's provisions of his policy, or accept the settlement as payment in full for his damages thus releasing the underinsurer from liability."

We agree with the circuit court's order as stated in Judge Merriam's decision to the extent that it decided that "a right of subrogation exists in underinsurance contracts."[12]

We cannot agree, however, that merely by the *ipse dixit* of the trial court the rights of the underinsurer can be dealt with in so summary a fashion. The circuit court states that Vogt can accept the $15,000 settlement offered by Progressive provided that WECC's subrogation rights are maintained. We find this to be an impossibility under the contract of insurance which provides for subrogation only if WECC first makes payment to Vogt. No subrogation rights may be acquired by reason of the tortfeasor's payment to the insured. The contract simply does not so provide. Subrogation either by contract or by law can only arise if the insurer makes payment to the insured. Moreover, for Vogt to simply accept the payment of policy limits from Progressive and then to give a release to the tortfeasor would invalidate any right of subrogation and could, under the WECC policy, result in a forfeiture of his own coverage. Additionally, we question why Progressive and Schroeder would pay the policy limits if they were not to be released.[13] We conclude that the order,

---

[12] This was the summary of the trial court's "holding" that appeared in the court of appeals certification—this despite the fact no order appears in the record.

[13] This question does not arise under the *Schmidt* procedure. Progressive and Schroeder are not parties to the transaction between Vogt and WECC. By meeting the amount of the proposed settlement, the underinsurer is, in effect, not consenting to the settle-

if such it be, of the circuit court, although it is predicated upon a generally correct proposition—that in the present circumstances WECC has, or may acquire, a right of subrogation—does not reflect the law of subrogation or the realities of insurance practice.

Accordingly, we modify the order to provide that the cause be remanded to the circuit court for such period of time as the circuit court may consider necessary for Wisconsin Employers Casualty Company to consider the settlement proposed by its insured and Schroeder and his insurer. If it wishes to protect its right of subrogation, it must make payment to the insured of its obligation under the policy in respect to underinsurance and, consistent with *Schmidt*, which we accept as establishing an appropriate procedure, make payment of the underinsurance coverage under the policy. That in effect is a rejection of the settlement, and it may thereafter, if it wishes, assert its right of subrogation acquired by payment, continue the action in its insured's name, or proceed to arbitration under the policy.[14] An acceptance of the settlement would mean that Progressive and Schroeder would pay Vogt $15,000, they would be released, and WECC would have abandoned its subrogation right. Obviously, this would be done only if after consideration WECC concluded that subrogation against Schroeder would be substantially worthless.

---

ment. Consequently, there is no release of the underinsured tortfeasor and its liability insurer.

[14] It is asserted by WECC that any arbitration rights under the policy have been waived. That question is not before us, nor have the parties addressed themselves to this point.

Accordingly, we remand for further proceedings consistent with this opinion. Because we agree with the trial court's general conclusion that subrogation may be an appropriate remedy of an underinsurer against a tortfeasor, we modify the order and, as modified, we affirm.

*By the Court.*—Order modified and, as modified, affirmed, and cause remanded for further proceedings.

STEINMETZ, J. *(concurring)*. I agree with the majority's conclusion that an underinsurer acquires subrogation rights against a tortfeasor when the underinsurer pays benefits to its insured. I disagree, however, with the majority's implicit conclusion that consent to settlement clauses in underinsurance policies are not enforceable. I would hold that such clauses are enforceable when the insured intends to seek underinsurance benefits from the underinsurer in addition to the tortfeasor's settlement. The underinsurer, however, must promptly process the underinsurance claim and invoke the contractual dispute resolution procedures, if necessary, as a condition of its refusal to consent to a proposed settlement. The court, therefore, should remand the matter to the circuit court with directions to the insured to decide whether to make a claim for underinsurance benefits. The underinsurer then can promptly process and resolve the claim, and thereby free the insured to settle with the tortfeasor.

Before discussing the merits of this case in more detail, I believe the procedure adopted by the majority needs to be clarified. It is unclear from the opinion what options an underinsurer may exercise to protect its subrogation rights. I fear that the opinion can be construed to require an underinsurer to always substi-

tute its funds for the offered settlement of a tortfeasor. I do not believe the majority intends this result. It certainly is not the only option identified in *Schmidt v. Clothier,* 338 N.W. 2d 256 (Minn. 1983), on which the majority relies.

The *Schmidt* decision clearly provides the underinsurer with the option to process and resolve the underinsurance claim prior to settlement with the tortfeasor.

> "Once an insurer has paid the benefits it contractually owes to its insured and gives notice thereof to the tortfeasor, a subsequent release obtained by the tortfeasor will not defeat the subrogation right but rather will be viewed as a waiver of the rule against splitting the cause of action. *Travelers Indemnity Co. v. Vaccari,* 310 Minn. 97, 245 N.W. 2d 844 (1976). If the tortfeasor is released before payment by the insurer, however, no subrogation rights ever arise. *Great Northern Oil Co. v. St. Paul Fire & Marine Insurance Co.,* 291 Minn. 97, 99–100, 189 N.W. 2d 404, 406–07 (1971). An underinsurer which promptly sends an underinsurance claim to arbitration and says its insured will be protected from the effects of a settlement and release of the tortfeasor." *Id.* at 262.

This procedure allows the underinsurer to determine and pay contractual benefits prior to settlement with the tortfeasor. The underinsurer's subrogation right is fully protected by this procedure without the need for the underinsurer to also match the tortfeasor's settlement offer. The underinsurance claim meaningfully can be processed before settlement with the tortfeasor because the limit of the underinsurer's liability is for the amount of damages suffered by the insured in ex-

cess of the liability limits of the tortfeasor. This measure of liability permits the underinsurance claim to be processed immediately, without regard to any eventual settlement, because the underinsurer's liability can be determined by applying the contract procedures, after determining the tortfeasor's liability insurance coverage.

The majority opinion fails to recognize that the *Schmidt* decision allowed an underinsurer two distinct options to protect its subrogation rights. The Minnesota Supreme Court clearly recognized that an underinsurer could: (1) process the underinsurance claim and pay benefits prior to settlement; or (2) match the tortfeasor's settlement offer and then process the underinsurance claim. The court specifically stated:

> "If, on the other hand, damages were substantially more than the liability limits and the tortfeasor had substantial assets, *the underinsurer could substitute its payment to the insured in an amount equal to the tentative settlement.* In this situation, the underinsurer's payment would protect its subrogation rights to the extent of the payment, and the insured would receive the amount of the settlement offer in cash. *The underinsurer would then have to arbitrate the underinsured claim* and could, thereafter, attempt to negotiate a better settlement or could proceed to trial in the insured's name. *We note again that prompt assessment, arbitration, and payment of underinsurance claims will protect the underinsurer's subrogation rights, and the underinsurer will avoid having to choose later between either acquiescing in the settlement or substituting its check for the amount of the settlement offer." Id.* at 263. (Emphasis added.)

Thus, the *Schmidt* decision established the following time frame for the underinsurer's actions to protect its subrogation rights:

(1) Tortfeasor offers to settle with insured.

(2) Insured notifies underinsurer of settlement offer and insured's intent to claim underinsurance benefits.

(3) Trial court establishes time within which the underinsurer must decide whether to protect subrogation rights.

(4) Underinsurer has option to process underinsurance claim and pay contract benefits prior to expiration of time for protecting subrogation rights. This frees insured to accept tortfeasor settlement without defeating underinsurer's subrogation rights.

(5) Underinsurer also has option to substitute its funds for tortfeasor settlement offer, thereby preventing settlement, but giving insured the benefit of the settlement.

(6) If the underinsured opts to substitute its funds for the tortfeasor's settlement offer, the underinsurer then processes the underinsurance claim with the insured and resolves any disputes by arbitration procedure.

(7) If the underinsurer substituted its funds for the tortfeasor's settlement offer, the underinsurer is subrogated in the amount of the settlement offer it matched, plus any underinsurance benefits it paid to the insured. The underinsured can then attempt to recover the entire amount from the tortfeasor, who was not previously released because his original settlement offer was not accepted.

(8) Finally, the underinsurer also has the option to both refuse to pay contract benefits or to substitute its funds for tortfeasor's settlement offer within time provided by trial court. The insured is then free to accept settlement and the insurer acquires no subrogation rights.

Both procedures identified in *Schmidt* protect the underinsurer's subrogation rights because benefits are paid prior to settlement with the tortfeasor. The two options, however, are otherwise dissimilar in operation. If the underinsurer processes the underinsurance claim and pays benefits prior to settlement with the tortfeasor, any subsequent settlement by the insured has no effect on the insurer's subrogation rights. *See Heifetz v. Johnson,* 61 Wis. 2d 111, 124, 211 N.W.2d 834 (1973). Significantly, however, after the underinsurer has paid benefits, the insured is then free to accept the tortfeasor's settlement offer precisely because such a settlement does not affect the insurer's subrogation rights. The majority obfuscates this point by stating that the payment of underinsurance benefits constitutes a rejection of the settlement offer. Majority opinion at pages 25 and 26, n. 13 and 14. In fact, the payment of underinsurance benefits is simply the condition precedent to the insured's right to settle with the tortfeasor. After underinsurance benefits are paid, the insured is then free to settle with the tortfeasor. It would make no sense to hold that the payment of underinsurance benefits precludes settlement with the tortfeasor because the insured otherwise would not receive full insurance benefits.

The majority opinion is confusing about the effect that paying underinsurance benefits will have on the insured's right to settle. This confusion results from

the majority's incorrect conclusion that "the price of protecting its subrogation right is payment to its own insured in the sum offered by the tortfeasor's insurance company." At 21–22. The majority equates underinsurance benefits with the settlement amount. This equation is incorrect. In fact, underinsurance benefits constitute the insurance coverage for damages in excess of the tortfeasor's insurance coverage. Such benefits may be more or less than the tortfeasor's coverage, depending on the amount of damages and the amount of the tortfeasor's insurance coverage. Thus, the majority's conclusion that the underinsurance benefits must always match the settlement offer in order to preserve subrogation rights is not true.

The majority opinion also is confusing about the effect that the payment of underinsurance benefits has on the insurer's rights. The majority states that the payment of benefits "in effect is a rejection of the settlement, and it may thereafter, if it wishes, assert its right of subrogation acquired by payment, continue the action in its insured's name, or proceed to arbitration under the policy." At 26. This statement incorrectly assumes that the payment of policy benefits means that the underinsurer substitutes its funds for the tortfeasor's settlement offer. This is inconsistent with the majority's own recognition that the insured evaluates and may arbitrate the underinsurance claim in order to satisfy the amount owed under the policy. At 23–24. Once the insured pays benefits, the claim between the underinsurer and the insured is settled and resort to further arbitration is foreclosed. Also, because the insurer's subrogation claim is unaffected by a subsequent settlement with the tortfeasor, the insurer cannot deny the right to such settlement.

32

To summarize, an underinsurer has two options under *Schmidt* when confronted with a proposed settlement between its insured and the tortfeasor. First, the insurer may process and settle any underinsurance claim, and thereby protect its subrogation right despite any subsequent settlement between the insured and the tortfeasor. Alternatively, the insurer can match the tortfeasor's settlement offer and thus prohibit the insured from settling with the tortfeasor. In the latter situation, the insurer resolves the underinsurance claim after matching the tortfeasor's settlement offer. These are the options recognized by *Schmidt,* and which the majority improperly collapses into a single option.

The second option, it should be noted, is only needed if the underinsurer and the insured do not settle the underinsurance claim in the time allowed by the circuit court. I do not believe this option is necessary because I would not authorize the circuit court to place an arbitrary limit on the time for resolving the underinsurance claim. I base this conclusion on the fact that the insurance policy in this case does not authorize judicial limitation on the time for settling the underinsurance claim.

The language of the contract is significant because this case involves the construction of an insurance policy. Thus, it is a simple contract action. The time limit for resolving the underinsurance claim, therefore, must be ascertained by applying basic rules of contract construction. Where a time limit is not specified in the policy, I believe the basic rules of contract would impose a "reasonable" time limit. This rule is appropriate because it permits settlement with the underinsurer and the tortfeasor without the need for litigation.

Under the majority's analysis, which requires a circuit court to set a time limit for settling the underinsurance claim, an injured party must file a lawsuit against the tortfeasor in order to get before a circuit court. I know of no contract rule which authorizes this court to impose such a requirement, which incidentally may delay settlements because of the time needed for filing a complaint and answer, securing a hearing date, and reaching a judicial determination.

I believe that a better solution to the problem in this case is to permit the underinsurer a reasonable time to resolve the underinsurance claim, without placing an arbitrary time limit on this issue. Permitting the underinsurer a reasonable time to secure a complete resolution of the underinsurance claim obviates the need for the underinsurer to either surrender its prospective subrogation right or to match the tortfeasor's settlement offer without knowing how the underinsurance claim will be resolved.

The underinsurer has a contractual right to have a claim arbitrated. I believe that this right is only meaningful if it can be exercised prior to deciding whether to make payment under the contract. Because the circuit court may not allow sufficient time to arbitrate a disputed claim, I believe the majority opinion improperly limits the underinsurer's contractual rights. Underinsurance is purely a contractual right, rather than a statutory right, and the court should not limit the contract terms, including the underinsurer's right to refuse to consent to settlement until arbitration is completed. Although the insured therefore must delay settlement with the tortfeasor, the insured freely agreed to this possible delay when it contracted for un-

derinsurance benefits. It is a condition the insured bears for protection against underinsured tortfeasors.

My approach to the issue in this case does not disadvantage the insured. I would require the insured to inform the underinsurer, at the time he seeks consent to settle with the tortfeasor, whether he also is claiming underinsurance benefits. The underinsurer cannot otherwise determine whether to consent to the proposed settlement. Moreover, it is not an onerous burden to require the insured to make an underinsurance claim at that time. The insured obviously must evaluate his case in order to settle with the tortfeasor. Thus, he should be able to make his underinsurance claim, if he, in fact, intends to make a claim.

Assuming the insured makes an underinsurance claim, the underinsurer can deny its consent to settle in order to protect its possible subrogation right. The underinsurer, however, must immediately begin to process the claim as a condition of exercising the contractual right to deny settlement. The consent to settlement clause serves the sole function of protecting the underinsurer's subrogation interest. The underinsurer, therefore, cannot deny consent to settle without also immediately undertaking to resolve the underinsurance claim. Also, the underinsurer waives the consent to settle provision if it denies coverage, without invoking the arbitration procedure.

This procedure essentially requires the insured to resolve his claim with the underinsurer before settling with the tortfeasor. I do not believe this is unreasonable. If the insured expects to recover part of his damages from a source other than the tortfeasor, equity requires that he follow a procedure which protects the collateral source's subrogation right. Also, resolving

the underinsurance claim prior to settlement with the tortfeasor will not substantially delay the insured's ultimate recovery. The underinsurance policy provides for arbitration of disputed claims. The policy, therefore, expresses a clear preference for settlement or arbitration of underinsurance claims, rather than litigation. *See Worthington v. Farmers Ins. Exchange,* 77 Wis. 2d 508, 519, 253 N.W. 2d 76 (1977). The policy procedure, when promptly invoked, allows for expeditious resolution of the underinsurance claim. In many instances, the claim will be settled within the time allowed by a circuit court. Disputed claims that go to arbitration may not be resolved that quickly, but the delay usually will be only a matter of months. Thus, the procedure I recommend has the advantage of expeditiously resolving the insured's entire claim, including the underinsurance portion.

In summary, my disagreement with the majority opinion concerns a narrow issue. I agree that the underinsurer acquires a subrogation right for benefits it pays. I also would require the underinsured to immediately begin to process and resolve the underinsurance claim as a condition of withholding consent to a settlement with the tortfeasor. However, I would not grant to the circuit court the authority to establish an arbitrary time in which to process and arbitrate the underinsurance claim. I would permit an unspecified, but reasonable, amount of time to resolve the claim. A reasonable amount of time depends on the facts of each case, limited by the underinsurer's good faith duty to act promptly and diligently.

I am authorized to state that Mr. JUSTICE WILLIAM G. CALLOW joins this concurring opinion.