Bruce MULLER and Karen Muller
d/b/a B & K Sports and Liquors, Plaintiffs-
Respondents-Cross-Appellants-Petitioners,

v.

SOCIETY INSURANCE,
Defendant-Appellant-Cross-Respondent,

George JERRICK, United Fire and Casualty and
Robert Sorenson d/b/a Community Insurance,
Defendants.

Supreme Court

*No. 2006AP976. Oral argument October 31, 2007.
—Decided May 30, 2008.*

2008 WI 50

(Also reported in 750 N.W.2d 1.)

ABRAHAMSON, C.J., dissents.
BRADLEY and BUTLER, JR., JJ., join.

For the plaintiffs-respondents-cross appellants-petitioners there were briefs by *William L. Norine* and *Norine Law Firm,* Grantsburg, and oral argument by *William L. Norine.*

For the defendant-appellant-cross-respondent there was a brief by *Joe Thrasher* and *Thrasher, Doyle, Pelish & Franti, Ltd.,* Rice Lake, and oral argument by *Joe Thrasher.*

An amicus curiae brief was filed on behalf of the Wisconsin Insurance Alliance, Property Casualty Insurers Association of America, Civil Trial Council of Wisconsin and National Association of Subrogation Professionals by *James A. Friedman* and *Godfrey & Kahn, S.C.,* Madison.

An amicus curiae brief was filed on behalf of The Wisconsin Academy of Trial Lawyers by *Mark L.*

*Thomsen, Edward E. Robinson, Brett A. Eckstein,* and *Cannon & Dunphy, S.C.,* Brookfield.

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals, *Muller v. Society Ins.,* 2007 WI App 44, 300 Wis. 2d 463, 730 N.W.2d 668, reversing a judgment of the circuit court for Polk County, Robert H. Rasmussen, Judge.

¶ 2. The question presented is whether an insurer may retain in full a subrogation settlement with a tortfeasor and a tortfeasor's insurer after its insureds have settled with the tortfeasor and the tortfeasor's insurer for an amount less than necessary to make the insureds "whole," even though the tortfeasor's insurance policy limits were sufficient to cover all claims, including those of both the insureds and the insurer.

¶ 3. The plaintiff insureds, Bruce and Karen Muller (the Mullers), claim that their property insurer, Society Insurance (Society), may not retain its subrogation settlement with a tortfeasor, George Jerrick (Jerrick), and his insurer, United Fire and Casualty (United), because the Mullers have not been "made whole" under the rule of *Garrity v. Rural Mutual Insurance Company,* 77 Wis. 2d 537, 253 N.W.2d 512 (1977), *Rimes v. State Farm Mutual Automobile Insurance Company,* 106 Wis. 2d 263, 316 N.W.2d 348 (1982), and their progeny. To resolve this case, we must evaluate our subrogation and "made whole" jurisprudence in light of the equitable considerations surrounding settlements.

¶ 4. We hold that the made whole doctrine is not implicated in this case. Specifically, the doctrine does not apply when an insurer has fully satisfied its obligations under an insurance contract, given its insureds the opportunity to settle their claim with the tortfeasor

and the tortfeasor's insurer, the pool of settlement funds available to the insureds exceeds the total claims of both the insureds and the insurer, and the insureds settle their claim, even though the insureds' settlement, together with the insurer's policy payments, does not satisfy the insureds' total claim. In these circumstances, the inequitable prospect of an insurer competing with its insureds for an inadequate pool of funds is not present, and the equities favor the insurer. Thus, we conclude that Society is entitled to retain its entire subrogation settlement with United and Jerrick and that the Mullers have no right to a portion of Society's subrogation settlement. Accordingly, we affirm the court of appeals.

## I. FACTS AND PROCEDURAL HISTORY

¶ 5.    Bruce and Karen Muller owned a sporting goods store in Milltown, Wisconsin. On August 11, 2001, a fire destroyed the store, resulting in a claimed total loss of $697,981.58. The Mullers believed and alleged that the fire was caused by the negligence of George Jerrick, an electrical contractor hired to install wiring during a remodeling project at the store. Jerrick carried liability insurance with United Fire and Casualty, with policy limits of $1,000,000.

¶ 6.    The Mullers carried property insurance with Society Insurance, but their coverage did not equal their total loss. Society paid the Mullers their policy limits ($407,378.88), but this payment left the Mullers with a claimed uninsured loss of $290,602.70.

¶ 7.    On December 17, 2001, the Mullers sued Jerrick and United to recover their uninsured loss.[1] The Mullers named Society as a defendant, claiming

---

[1] The Mullers' complaint also included one count related to the alleged negligence of their insurance agent, Robert Soren-

additional business interruption coverage. This issue later dropped out of the case. The Mullers did not name Society as a subrogated party pursuant to Wis. Stat. § 803.03(2),[2] but Society cross-claimed against Jerrick and United for subrogation.

¶ 8.   On March 4, 2003, the parties attended a mediation session in Eau Claire.[3] Prior to this session, the Mullers and Society had been working together to prepare for a May 19, 2003, trial. At the session, the Mullers and Society met separately with Jerrick and United. Society reached a tentative settlement with Jerrick and United on Society's subrogation claim. It did not sign a formal agreement. Society's tentative settlement for $190,000 was conditioned upon the Mullers settling with Jerrick and United or resolving the case at trial.

¶ 9.   The Mullers, however, did not reach a settlement with Jerrick and United and were disheartened by the prospect of going to trial against Jerrick and United without Society's assistance.

¶ 10.   Almost immediately, the Mullers' attorney called Judge Rasmussen's office to seek the court's direct help in additional mediation. In a March 28, 2003, letter to the court, the Mullers' attorney made a formal request for additional mediation, explaining that there had been a "settlement, the amount and terms of which remain undisclosed," and that Society would be withdrawing from the case. The letter stated

son. Sorenson allegedly failed to recommend that the Mullers secure sufficient insurance coverage for their property. The Mullers settled with Sorenson for $30,000.

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise indicated.

[3] Of course, the mediation sessions are not part of the record. *See* Wis. Stat. § 904.085.

that "there were unfortunately some basic miscommunications at the mediation held on March 4, 2003, which may have prevented a global settlement at that time." The letter raised the prospect of the Mullers pursuing "any claims they might have against Society under the *Rimes* doctrine." The letter was copied to all parties.

¶ 11.    On May 19, 2003, a second mediation session was conducted, this time with Judge Rasmussen. Only the Mullers, Jerrick, and United were involved in the Rasmussen mediation. At this session, the Mullers voluntarily settled their claim against Jerrick and United for $120,000, which was $170,602.70 less than their claimed uninsured loss. As stated, Jerrick's liability insurance policy had a limit of $1,000,000.

¶ 12.    The Mullers' settlement did not include an agreement to indemnify Jerrick or United from the subrogation claim by Society. Thus, Society later settled with Jerrick and United for $190,000.

¶ 13.    Following these two settlements, the Mullers and Society briefed the issue of whether the *Rimes* made whole doctrine applied to allow the Mullers to recover the remainder of their claimed uninsured loss from Society's subrogation settlement with Jerrick and United.

¶ 14.    On September 30, 2004, the circuit court issued a written decision that concluded that the combination of the Mullers' $120,000 settlement with Jerrick and United and the $407,378.88 indemnity payment the Mullers received from Society did not make the Mullers whole for their fire casualty loss. Focusing on the "longstanding legal, equitable and public policy principles which [underlie] the decision in *Rimes* and its progeny," the circuit court determined that "United defined what constituted the 'limited pool' " of funds available to pay both Society's and the Mullers' claims.

The court said that because Society and the Mullers were in competition for this limited pool of $310,000,[4] Society was "not entitled to retain any of those funds unless and until the plaintiffs have been 'made whole.'" The circuit court determined that the Mullers were entitled to a hearing regarding the amount that would make them whole, and that amount was to be recovered from Society's $190,000 subrogation settlement with Jerrick and United.

¶ 15. Before such a hearing took place, the Mullers and Society held a third mediation session. After this session, the Mullers and Society signed a written stipulation that the Mullers' "total unreimbursed loss" for their fire casualty was $59,725.60.

¶ 16. With this amount ascertained, the circuit court entered judgment in favor of the Mullers and against Society for $59,725.60.

¶ 17. Society appealed, and the Mullers cross-appealed, seeking to recover the entire amount ($190,000) of Society's subrogation settlement with Jerrick and United.

¶ 18. On February 20, 2007, the court of appeals reversed the circuit court, holding that Society was entitled to retain its entire subrogation settlement with Jerrick and United. The court of appeals noted the general rule that "an insurer is not allowed to recover its subrogation interest until its insured has been made whole." *Muller*, 300 Wis. 2d 463, ¶ 14 (citing *Garrity*, 77 Wis. 2d at 541–42). However, the court of appeals observed that: (1) the $1,000,000 limit of Jerrick's policy with United was "far more than adequate to cover all the claims"; and (2) the amount to be recovered was not

[4] This $310,000 sum reflected United's combined settlements of $120,000 with the Mullers and $190,000 with Society.

limited by either Society or the Mullers. *Muller,* 300 Wis. 2d 463, ¶¶ 16–17. The court of appeals reasoned that, given these facts, "the Mullers made a conscious choice to accept less than their losses . . . [that] . . . cannot plausibly be tied to any limited funds." *Id.,* ¶ 18. Therefore, the court of appeals determined that the Mullers had the first opportunity to recover their losses and failed to do so, and it reversed in favor of Society. *Id.*

¶ 19. The Mullers petitioned this court for review, which we granted on June 12, 2007.

## II. STANDARD OF REVIEW

¶ 20. This case focuses on the respective rights of an insurer and its insureds when: (1) the insureds have settled with a tortfeasor and the tortfeasor's insurer for an amount that is less than necessary to satisfy all the insureds' claims; but (2) the tortfeasor's insurance policy limit was sufficient to cover all claims, including those of the insureds and their subrogated insurer. These facts require us to determine the applicability of the made whole doctrine to a given set of undisputed facts, a question of law that we review de novo. *Schulte v. Frazin,* 176 Wis. 2d 622, 628, 500 N.W.2d 305 (1993); *Oakley v. Fireman's Fund of Wis.,* 162 Wis. 2d 821, 826, 470 N.W.2d 882 (1991).

## III. ANALYSIS

¶ 21. We begin our analysis with a general discussion of subrogation and the made whole doctrine and then delve into our made whole doctrine jurisprudence.

¶ 22. Subrogation is a legal doctrine that provides for the substitution of one party, the subrogee, in place of another, the creditor (or subrogor), to whose rights the substituted party succeeds in relation to a debt. *See*

421

16 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 222:5 (3d ed. 2000) (hereinafter *Couch*). In the insurance context, subrogation is a purely derivative right that permits an insurer who has been contractually obligated to satisfy a loss created by a third party to step into the shoes of its insured and to pursue recovery from the responsible wrongdoer. *See* 73 Am. Jur. 2d *Subrogation* § 1 (2007). As a substituted party, a subrogated insurer has no greater rights than its insured. *Couch, supra,* at § 222:5. The doctrine of subrogation enables an insurer that has paid an insured's loss pursuant to a policy of property insurance to recoup that payment from the party responsible for the loss. Elaine M. Rinaldi, *Apportionment of Recovery Between Insured and Insurer in a Subrogation Case,* 29 Tort & Ins. L. J. 803, 803 (1994) (citing John J. Pappas & Scott S. Katz, *Insuring Real Property* § 41.01[1] (Stephen A. Cozen ed. 1992)).

¶ 23.  Subrogation rests upon equitable principles. *Petta v. ABC Ins. Co.,* 2005 WI 18, ¶ 27, 278 Wis. 2d 251, 692 N.W.2d 639. In part, the law invokes subrogation to avoid unjust enrichment. *Ruckel v. Gassner,* 2002 WI 67, ¶ 15, 253 Wis. 2d 280, 646 N.W.2d 11. Once an insured has been fully compensated for his loss, any additional recovery by the insured would constitute unjust enrichment. *Couch, supra,* at § 223:133.

¶ 24.  Subrogation effectuates an equitable adjustment among parties to prevent unjust enrichment in at least two ways. *See* Johnny C. Parker, *The Made Whole Doctrine: Unraveling the Enigma Wrapped in the Mystery of Insurance Subrogation,* 70 Mo. L. Rev. 723, 725–26 (2005). First, subrogation compels payment of a debt by one who in equity ought to pay, namely, the

tortfeasor.[5] *Id.* at 726 (footnotes omitted). Second, subrogation precludes an insured from recovering twice for the same loss. *Id.*

¶ 25.    Balancing the insurer's right to recoup benefits it has paid against an insured's right to obtain full compensation for loss is also an equitable concern in subrogation. *See Petta,* 278 Wis. 2d 251, ¶ 34 (citing *Schulte,* 176 Wis. 2d at 630). Justice Benjamin Cardozo once reflected upon this equitable concern in the suretyship context:

> A surety who has undertaken to pay the creditors of the principal, though not beyond a stated limit, may not share in the assets of the principal by reason of such payment until the debts thus partially protected have been satisfied in full. This is the rule where the right to a dividend has its basis in the principle of equitable subrogation. "A surety liable only for part of the debt does not become subrogated to collateral or to remedies available to the creditor unless he pays the whole debt or it is otherwise satisfied."

*Am. Sur. Co. v. Westinghouse Elec. Mfg. Co.,* 296 U.S. 133, 137 (1935) (quoting *United States v. Nat'l Sur. Co.,* 254 U.S. 73, 76 (1920)). Thus, equity provides that subrogation ordinarily does not arise until the underlying debt or loss has been paid in full. *Petta,* 278 Wis. 2d 251, ¶ 27 (citations omitted). This "antisubrogation rule" is known as the made whole doctrine. *Id.*

[13]

¶ 26.    Wisconsin's made whole doctrine attempts to balance all these equitable concerns. Equity does not

---

[5] Thus, an insurer is substituted to the rights of the insured so that it can seek recovery for its payment from the party responsible for the loss.

lend itself to the application of black letter rules. *Id.*, ¶ 34. It is heavily influenced by particular facts. The equitable balance can become tenuous when an insured settles unilaterally with the tortfeasor and the tortfeasor's insurer without securing enough funds to be fully compensated because someone is going to be disappointed. The case before us involves a situation in which the Mullers voluntarily settled for considerably less than Jerrick's policy limits, yet were not fully compensated for their loss. To close the gap, the Mullers are demanding at least part of their insurer's subrogation settlement. ·

¶ 27.  We have alluded to tortfeasor policy limits as a factor to weigh in past decisions.[6] In this case it is a central factor. To explain its impact, we trace the history of the made whole doctrine in Wisconsin, beginning with *Garrity*.

¶ 28.  In *Garrity*, we recognized that subrogation rests upon equitable principles including a rule that the insured has priority over his insurer when there is an

---

[6] *See, e.g., Garrity v. Rural Mut. Ins. Co.,* 77 Wis. 2d 537, 539, 253 N.W.2d 512 (1977) (describing facts where the tortfeasor possessed a policy worth $25,000 when the plaintiffs' damages were alleged to be $110,000); *Blue Cross & Blue Shield United of Wis. v. Fireman's Fund Ins. Co. of Wis.,* 140 Wis. 2d 544, 547, 411 N.W.2d 133 (1987) ("On December 24, 1982, Blue Cross learned that Kyle and Robert Adams had settled their personal injury claim for $60,000—$40,000 less than Fireman's policy limits."); *Schulte v. Frazin,* 176 Wis. 2d 622, 633, 500 N.W.2d 305 (1993) ("[s]ettling defendants typically have limited policy limits"); *Paulson v. Allstate Ins. Co.,* 2003 WI 99, ¶ 27, 263 Wis. 2d 520, 665 N.W.2d 744 ("The specter of an insurer competing with the insured for a limited amount of funds is simply not raised by the facts of this case. There has been no discussion of policy limits or a limited pool of funds for which Midwest and Paulson are competing.").

inadequate pool of funds. *Garrity,* 77 Wis. 2d at 541, 543. The Garritys owned a dairy farm and had a fire insurance policy with Rural Mutual Insurance Company (Rural Mutual). *Id.* at 539. Their barn was destroyed by a fire allegedly caused by the negligent driving of a truck by an employee of two brothers doing business as Bowers Brothers Feed Mill. *Id.* The Bowers mill also held a Rural Mutual insurance policy with a liability limit of $25,000 on the truck. *Id.* The Garritys claimed the total loss of the barn was $110,000. *Id.* They recovered the limits on their insurance policy—$67,227.12—from Rural Mutual and then filed suit against the Bowerses and Rural Mutual for $110,000. *Id.* Rural Mutual denied that the Bowers truck was driven negligently, and it filed a third-party complaint against itself in its role as the Garritys' insurance carrier to determine its rights and liabilities as a third-party defendant. *Id.* at 539–40. The Garritys' insurance contract with Rural Mutual included a provision giving Rural a potential right of subrogation. *Id.* at 540. Hence, the gist of Rural's move was an attempt to keep the $25,000 under the Bowerses' policy as subrogation for the $67,000 payment it had made under the Garritys' policy.

¶ 29.   This court noted the equitable principle that subrogation ensures that "one, other than a volunteer, who pays for the wrong of another should be permitted to look to the wrongdoer to the extent he has paid and be subject to the defenses of the wrongdoer." *Id.* at 541 (citations omitted). The purpose of the doctrine is to avoid unjust enrichment. *Id.* (citations omitted). The cause of action against the tortfeasor is viewed as an indivisible claim, and the plaintiff holds this claim until he is given the opportunity to fully recover his loss. *Id.*

at 542.[7] Logically, this principle establishes the insured's priority over his insurer in pursuing recovery, and "the general rule [is] that there is no subrogation until the insured has been made whole." *Id.* (citations omitted).

¶ 30. This general rule controlled in *Garrity* because of the inequity of Rural Mutual competing with its own insured for the Bowerses' $25,000 Rural Mutual liability policy limit. The parties stipulated that the Garritys had not been made whole for the loss they suffered. *Id.* at 543. Given this stipulation and the limited funds available from the tortfeasors' policy, we concluded that "Rural Mutual's right to share in the $25,000 recoverable from themselves as the insurer of the tort-feasor is secondary to the insured's right to recovery." *Id.*

¶ 31. The equities in *Garrity* contrast with those in the Mullers' case because in *Garrity* there was a limited pool of funds—the $25,000 liability policy—that was insufficient either to make the Garritys whole or to reimburse Rural Mutual for the policy benefits it had already paid. Both claims could not be satisfied by this $25,000 pool. In the Mullers' case, the $1,000,000 liability policy held by Jerrick was more than sufficient to cover *all* claims. In addition, in this case, the recovery priority rule established by *Garrity* was maintained.

---

[7] The court clarified the "indivisible claim" in a subsequent passage, saying:

> We have disapproved of the language in *Patitucci v. Gerhardt,* 206 Wis. 358, 362, [240] N.W. 385 (1932) that a subrogee is an "owner" of the insured's claim. In *Heifetz v. Johnson,* 61 Wis. 2d 111, 120, 211 N.W.2d 834 (1973) we said, "It is better to think of the insurer as an assignee of part of the claim than to speak of the insured and the insurer as joint owners of the claim."

*Garrity,* 77 Wis. 2d at 546.

The Mullers settled with Jerrick and United before Society entered its own subrogation settlement, preserving the Mullers' right to be the first to tap available settlement funds.

¶ 32. Five years after *Garrity,* we applied the subrogation rule of priority in a personal injury case. The question presented for review in *Rimes* was:

> [W]hether an automobile insurer, State Farm Mutual Automobile Insurance Company, which, under a subrogation agreement signed by its insured, Palmer H. Rimes, has made payment under the medical-pay provisions of its policy, has the right to recover those payments out of the monies received by its insured in a settlement with negligent third-party tortfeasors and their liability insurers, when, according to the findings and judgment of the circuit court, the settlement figure was less than the total damages sustained by the insured as the result of an automobile accident.

*Rimes,* 106 Wis. 2d at 264. The plaintiffs, Palmer and Patricia Rimes, sustained damages of $300,433.54 but settled with the tortfeasors for $125,000. *Id.* at 264–65.

¶ 33. Palmer Rimes was severely injured while providing aid at the roadside scene of a traffic accident involving the vehicle of Roy Langdon (Langdon). *Id.* at 265. Langdon's vehicle had been rear-ended by the vehicle of Peggy Stiles (Stiles). *Id.* While Rimes was examining the Stiles vehicle, it was struck by another driver, Leonard Switzer (Switzer). *Id.* This collision caused severe injuries to Rimes. *Id.* Rimes and his wife Patricia sued Switzer, Stiles, and Langdon and their insurers. *Id.* Switzer carried a $300,000 liability insurance policy with Travelers Indemnity; Stiles and Langdon each carried policies of $50,000 with American Family. *Id.* State Farm, the Rimeses' insurer, was joined as a defendant because of its possible subrogation rights

as a result of medical payments of $9,649.90 made under two policies carried by the Rimeses. *Id.* at 265–66.

¶ 34. Prior to trial, Langdon and his insurer were dismissed by stipulation. *Id.* at 266. This left a pool of $350,000 (the $300,000 policy of Switzer and the $50,000 policy of Stiles) to cover the claims of both the Rimeses and State Farm. The remaining parties entered into a stipulation, providing that State Farm had a subrogated interest in recovery of the medical expenses paid to the Rimeses. *Id.* at 267. The stipulation further provided that State Farm was to recover its subrogated interest out of any judgment rendered or settlement entered in favor of the Rimeses. *Id.*

¶ 35. The Rimeses subsequently settled all claims with the remaining defendants for $125,000. *Id.* American Family paid $50,000, its policy limit, on behalf of Stiles, and Travelers Indemnity paid $75,000 of its $300,000 policy limit on behalf of Switzer. *Id.* A *new* stipulation for this settlement provided that $9,649.90 of the $75,000 from Switzer was to be held in escrow by the court pending a determination of State Farm's subrogation rights at a "trial." *Id.* All parties, including State Farm, signed this *new* stipulation that included the recitation: "This action is fully settled as to all claims for relief and all cross claims by all parties, except as specifically otherwise provided by this order." *Id.* The stipulation further provided that the action was to remain pending to determine the subrogation rights of State Farm at a subsequent proceeding. *Id.* at 268.

¶ 36. The circuit court took testimony for two days with regard to the damages sustained by the plaintiffs and the negligence aspects of the accident. *Id.* The court determined that total damages, including those for past and future medical expenses, lost earn-

ings, pain and suffering, and Patricia Rimes' loss of consortium claim, were $300,433.54. *Id.* at 269. The circuit court, relying upon *Garrity,* found that State Farm had no right to subrogation because the plaintiffs' settlement of $125,000 left them less than whole. *Id.*

¶ 37. The *Rimes* court upheld the circuit court, reiterating the rule that "[s]ubrogation is to be allowed only when the insured is compensated in full by recovery from the tortfeasor." *Id.* at 272. The court attempted to define "wholeness" generically: "Under Wisconsin law the test of wholeness depends upon whether the insured has been completely compensated for all the elements of damages, not merely those damages for which the insurer has indemnified the insured." *Id.* at 275. The court rejected State Farm's argument that the Rimeses' settlement with the tortfeasors was "an affirmation by them that they have been made whole as required by law." *Id.* at 273. Instead, the court held that their settlement, by its very nature, could not be viewed as an acknowledgement of full reimbursement for the wrong done because neither the Rimeses nor State Farm released the other in respect to the sum equal to the medical payments. *Id.* at 273–74.

¶ 38. Finally, the *Rimes* court reviewed the procedure utilized by the circuit court and endorsed what is now known as a *Rimes* hearing. *Id.* at 277–79. At this hearing, a "trial" is conducted before the court solely to ascertain the damages suffered by the plaintiff. *Id.* at 277. If the damages found exceed those actually recovered by the plaintiff from all sources, the plaintiff will be found to be less than whole and will not be required to disgorge any of the amounts by which he has been indemnified. *See id.* at 275–76.

¶ 39. *Rimes* is distinguishable from the present case. First, *Rimes* represents a case in which the subrogated insurer created a limited pool of funds by stipulating to the settlement with the tortfeasors, in the same way that the Rimeses stipulated with the tortfeasors. *See id.* at 267–68. The *insurer* agreed to let the tortfeasors off the hook. The subrogated insurer (State Farm) also stipulated that its dispute with the Rimeses (the insureds) was *not* settled, *id.,* and thus was subject to resolution by traditional equity principles. By contrast, in this case Society did not stipulate to a settlement with Jerrick and United at the same time as the Mullers, thereby preserving its right to settle or pursue a subrogation claim against Jerrick and United at a later date and for an amount greater than the Mullers' settlement. This fact scenario presents different equities from the settlement in *Rimes*.

¶ 40. Second, the personal injury claims in *Rimes* made estimation of damages much more imprecise and difficult than the property claims here. In *Rimes,* the settling parties had to estimate the value of claims for lost past and future earnings, past and future physical disability, pain and suffering, and past and future medical expenses, in addition to claims for loss of consortium, to determine total damages. *Id.* at 268–69. The value of these types of damages can be difficult to ascertain, making settlement talks more combative and less likely to accurately reflect the amount necessary to fully compensate the plaintiff. By contrast, in this case, the value of the plaintiffs' property loss was largely undisputed, making settlement negotiations between the plaintiffs and the tortfeasor hinge solely on the issue of the tortfeasor's liability. Normally, in a case like this one, settlement is likely to approach the plaintiff's

actual damages *if* insurance is available and *if* liability is clear. This equitable factor helps inform our decision.

¶ 41.  Third, *Rimes* involved an insurer's efforts to recover in subrogation against its own insured, not against the tortfeasor or the tortfeasor's insurer. *Id.* at 264. By contrast, the Mullers brought Society into this action as a defendant; Society then cross-claimed against Jerrick and United to protect its own interests. Society participated in the litigation, providing experts and its own attorneys to assist the Mullers in pursuing their settlement. This situation is different from the antagonistic posture of the parties in *Rimes,* where the insurer was seeking subrogation out of the settlement negotiated by its own insured.[8]

¶ 42.  Following *Rimes,* we explored the equitable considerations that determine the applicability of the *Garrity-Rimes* made whole doctrine. *Vogt v. Schroeder,* 129 Wis. 2d 3, 383 N.W.2d 876 (1986), involved the question of whether an underinsurer has a right of subrogation against an underinsured tortfeasor when the underinsurer makes a partial payment of its insured's damages. *Id.* at 7. A passenger (Vogt) in his own automobile was injured when the vehicle, driven by his son, collided with a vehicle driven by the defen-

---

[8] We observe that the means the Mullers utilized to be "made whole"—pursuing the proceeds of Society's settlement with Jerrick and United—operated as a sort of reverse-subrogation. By "reverse-subrogation," we mean that the typical positions are reversed; instead of the insurer pursuing the insured or tortfeasor for reimbursement, the insured is pursuing its own property insurer to be made whole.

By employing this strategy, the Mullers are attempting to receive more from Society by recovering part of Society's subrogation settlement than they would have under the limits of their insurance policy.

dant (Schroeder). *Id.* Schroeder's vehicle carried only $15,000 in liability coverage, and the personal injuries sustained by Vogt exceeded $15,000. *Id.* The Vogt vehicle, in addition to the usual liability coverage, was covered by an underinsured motorist rider of $50,000. *Id.* Because the liability prediction with respect to Schroeder was highly unfavorable, Schroeder's insurer offered to pay its policy limits of $15,000 in exchange for its release and the release of its insured. *Id.* at 8.

¶ 43. Vogt commenced an action against Schroeder. *Id.* at 10. Subsequently, as a part of that underlying action, Schroeder and his insurer filed a motion for a declaration of the right of the insurer to pay the policy limits to Vogt and the right of Vogt to release Schroeder and the insurer from any further liability. *Id.*

¶ 44. When the case reached this court on certification, the *Vogt* court reiterated that the made whole doctrine, as stated in *Garrity* and *Rimes,* rests upon equitable principles. *Id.* at 13. However, the court cautioned that some statements in *Rimes* and *Garrity* could not be applied literally because subrogation is an equitable doctrine that depends upon a just resolution of a dispute under a particular set of facts. *Id.* at 12 (citing 6A Appleman, *Insurance Law and Practice,* § 4051, at 110). "*Hence, only under fact situations where an equitable result will follow should the statements quoted above* [e.g., "the conventionally subrogated or contractual insurer has no share in the recovery from the tort-feasor if the total amount recovered by the insured from the insurer does not cover his loss," *Garrity,* 77 Wis. 2d at 544] *be applied literally.*" *Vogt,* 129 Wis. 2d at 12 (emphasis added). "*Garrity* recognizes that there are equitable principles to support subrogation other than those concerned with whether the injured or indemnified party is made whole or unjustly enriched." *Id.* at 13.

432

¶ 45. The *Vogt* court stated that "the wrongdoer should be responsible for his conduct and not be allowed to go scot-free by failing to respond in damages while another, an indemnitor for the injured party, is required to do so." *Id.* The court said that "in both *Garrity* and *Rimes* the court knew from the record that the funds available were insufficient to satisfy the damages of the injured party—i.e., to make him whole," therefore, equity did not permit the insurer to take these funds in subrogation. *Id.* at 14. We characterized both *Garrity* and *Rimes* as dealing with the issue of *priority* between the insured and his own insurer, saying that equity pointed to the conclusion that the insured, left less than whole in both cases, was to be afforded first priority in recovery. *Id.* at 14–15. We also pointed out the impact of State Farm *joining* the plaintiffs' settlement in *Rimes* as a factor weighing against granting State Farm priority. *See id.* at 15 n.5.

¶ 46. In sum, the holding in *Vogt* stands for the proposition that the made whole doctrine of *Garrity* and *Rimes* is not a simplistic or absolute rule. *Id.* at 15. Subrogation depends upon the application of equitable principles to the facts of each case, and those principles are concerned with preserving the rights of both the insured and subrogated insurer. *Id.* In short, sometimes, the made whole doctrine does not apply.

¶ 47. Consistent with *Vogt,* our holdings in *Blue Cross & Blue Shield United of Wisconsin v. Fireman's Fund Insurance Company of Wisconsin,* 140 Wis. 2d 544, 411 N.W.2d 133 (1987), and *Mutual Service Casualty Company v. American Family Insurance Group,* 140 Wis. 2d 555, 410 N.W.2d 582 (1987), repeated the fact that *Garrity* and *Rimes* should not control where the insured plaintiff and the subrogated insurer are not competing for a limited pool of funds.

433

¶ 48. In *Blue Cross,* we reviewed the issue of whether a subrogated insurer must allege that its insured was made whole to properly state a claim for relief when its insured has settled with a tortfeasor. *Blue Cross,* 140 Wis. 2d at 546. Although the case focused on this limited issue, the *Blue Cross* court had occasion to comment on the equities surrounding our decisions in *Garrity* and *Rimes.*

¶ 49. In *Blue Cross,* the plaintiff, Kyle Adams, was injured in a motor vehicle accident. *Id.* at 547. He was hospitalized, and his hospital bill of $10,202.50 was covered by Blue Cross & Blue Shield United of Wisconsin (Blue Cross). *Id.* After paying these expenses, Blue Cross became subrogated to the extent of the payments, and it notified the tortfeasor's insurance company, Fireman's Fund Insurance Company of Wisconsin (Fireman's), of its subrogation rights. *Id.* Thereafter, Adams settled separately with Fireman's for $60,000, which was $40,000 less than Fireman's' limits for his personal injury claim. *Id.* The settlement did not resolve Blue Cross's subrogation claim, but it did provide Fireman's with indemnity against Blue Cross's subrogation claim. *Id.* at 547, 553. Blue Cross then initiated an action against Fireman's and the tortfeasor to recover the $10,202.50 it had paid on behalf of Adams. *Id.* at 547. In doing so, Blue Cross did not allege in its complaint that Adams had been "made whole." *Id.* This court concluded that an insured who has settled his claim against the tortfeasor does not have to be made whole before a subrogated insurer may bring a subrogation claim against a tortfeasor or the tortfeasor's insurer. *Id.* at 546, 549.

¶ 50. First, we reiterated our holding in *Vogt* that there is no absolute rule that the insured must be made whole before an insurer can recover in subrogation. *Id.*

at 550 (citing *Vogt*, 129 Wis. 2d at 11–13). Instead, the equities of a particular case should control. *See id.* Second, we held that the compelling equitable factor that defeated the subrogation right asserted in both *Garrity* and *Rimes* (namely, the prospect of an insurer competing with its own insured for funds which are insufficient to make the insured whole) was not present in *Blue Cross. Id.* at 551. Third, we distinguished *Rimes* and *Garrity* on the grounds that both of those cases involved an insurer suing its own insured in subrogation; whereas, *Blue Cross* involved a subrogated insurer pursuing the tortfeasor and his insurer separately. *Id.* Because the facts presented no competition for a limited set of funds, Blue Cross was free to pursue subrogation. *Id.* Finally, we held that the indemnification agreement entered into when Adams settled with Fireman's could not be used to circumvent Blue Cross's subrogation right. *Id.* at 553–54.

¶ 51.  It must be noted that in *Schulte v. Frazin,* the court overruled the language of *Blue Cross* that disapproved the use of indemnification agreements by settling plaintiffs. *Schulte,* 176 Wis. 2d at 634. The court distinguished the equities in *Schulte* from the equities in *Blue Cross,* but it did not completely overrule the latter. *Id.* at 635 ("We do not completely overrule *Blue Cross,* however. *Blue Cross* still applies when a plaintiff and tortfeasor settle without involving the subrogated insurer and without submitting the issue of the subrogated insurer's rights to the circuit court.").

¶ 52.  The *Mutual Service* decision was released the same day as *Blue Cross*. In *Mutual Service* we determined that an insurer's subrogated interest was not satisfied when the insured settled with the tortfeasor's insurance company, and, pursuant to the settlement, the tortfeasor's insurance company issued a check made

payable to the insurer, its insured, and the insured's attorney. *Mutual Service,* 140 Wis. 2d at 557. We held that the trial court was in error when it dismissed the insurer's claim against the tortfeasor's insurer and found that the insurer's subrogation rights were extinguished by the check. *Id.* at 562.

¶ 53.    One interesting aspect of *Mutual Service* is the court's treatment of the insured's and subrogated insurer's interests as separate "claims" against the tortfeasor. We noted that an insurer whose policy with an insured includes a right to subrogation possesses an independent "cause of action against the tortfeasor and the tortfeasor's insurer for its subrogated interest." *Id.* at 561. The interests of the insurer and insured exist as "each owning separately a part of the claim against the tortfeasor." *Id.* (citing *Heifetz v. Johnson,* 61 Wis. 2d 111, 120, 211 N.W.2d 834 (1973); *Wilmot v. Racine County,* 136 Wis. 2d 57, 63–64, 400 N.W.2d 917 (1987)).[9]

---

[9] *Heifetz v. Johnson,* 61 Wis. 2d 111, 211 N.W.2d 834 (1973), provides some discussion of the appropriate way to frame the subrogated insurer's interest and contrast it with the insured's interest. *Heifetz* viewed the subrogated interest as an assignment of rights:

> However, it can be seen that [insured and insurer] are not really joint owners in the same sense as the joint payees of a note. Each actually owns separately a part of the liability of the tort-feasor. The insurer has a claim only for the money he paid to his insured and the insured by accepting payment has lost his right to demand payment of that sum from the tort-feasor. The insured can claim all other damages over and above that amount and the insurer has no claim to those damages. Thus it is better to think of the insurer as an assignee of part of the claim than to speak of the insured and the insurer as joint owners of the claim.

*Id.* at 120. *See also Ives v. Coopertools,* 208 Wis. 2d 55, 85 n.1, 559 N.W.2d 571 (1997) (Steinmetz, J., concurring).

¶ 54.   *Mutual Service* also reiterated the fact that neither *Garrity* nor *Rimes* is applicable in an action brought by a subrogated insurer against the tortfeasor or the tortfeasor's insurer "where the subrogated insurer's insured has previously settled with the tortfeasor." *Id.* at 563–64. This holding appears to be directly on point in this case.

¶ 55.   *Schulte* followed *Blue Cross* and *Mutual Service* and distinguished both cases while identifying the role that indemnification agreements play in establishing a "limited pool" of funds that creates competition between the insured and his insurer.

¶ 56.   In *Schulte,* the court reviewed the case of Barbara Schulte, a surgery patient who was injured when a surgical drill came in contact with her spinal cord. *Schulte,* 176 Wis. 2d at 625. Schulte's medical insurer, Compcare, paid $90,000 for her medical treatment. *Id.* at 625–26. When Schulte filed a medical malpractice suit against her surgeon, Dr. Frazin, and his insurer, Compcare was joined as a party and filed both a counterclaim against Schulte and a cross-claim in subrogation against Dr. Frazin. *Id.* at 626.

¶ 57.   Schulte settled with Dr. Frazin and his insurer for $2,460,000. *Id.* The settlement indemnified both defendants against further liability arising from the incident. *Id.* at 626–27. Schulte then requested a *Rimes* hearing to resolve Compcare's right of subrogation, *and it moved to extinguish that right. Id.* at 627. Compcare participated in the *Rimes* hearing, and Schulte presented evidence that her injuries amounted to between $2,950,000 and $4,790,000. *Id.* The circuit court determined that Schulte had not been made whole by her settlement and entered an order dismissing Compcare's counter and cross-claims. *Id.*

¶ 58. The *Schulte* court likened the case to *Rimes* and concluded that the made whole doctrine precluded Compcare's subrogation recovery. *Id.* at 630. The court distinguished *Blue Cross* and *Mutual Service* on the grounds that the insurers' rights in those cases were not resolved in a *Rimes* hearing, thereby emphasizing the need for insurer participation. *Id.* at 631, 636. In discussing *Blue Cross,* the *Schulte* court noted that competition for limited funds between the insured and his insurer arises when the tortfeasor's assets are limited. *Id.* at 632 (citing *Blue Cross,* 140 Wis. 2d at 552 n.3). The court recognized that subrogated insurers and insureds often compete for limited settlement funds and that "[s]ettling defendants typically have limited policy limits and assets and typically want to pay as little as possible." *Schulte,* 176 Wis. 2d at 633. Likewise, "[s]ettling plaintiffs typically want as much as possible." *Id.* This creates competition, "an equitable factor we cannot ignore." *Id.*

¶ 59. Resolution of the *Schulte* case hinged on the indemnity agreement granted by Schulte to Dr. Frazin and his insurer and the fact that Compcare was able to represent its interests at the *Rimes* hearing. The court noted that the existence of an indemnification agreement by the insured "indirectly creates the prospect that the insurer will be competing with its own insured." *Id.* at 634. The insurer's ability to participate in both the settlement process[10] and the *Rimes* hearing is

---

[10] The dissenting justice in *Schulte* focused on the fact that Compcare was notified of Schulte's settlement for less than policy limits *after* the settlement had occurred. *Schulte,* 176 Wis. 2d at 638 (Steinmetz, J., dissenting). The dissent concluded that Schulte could not claim that the made whole doctrine applied to bar subrogation when she agreed to accept a settlement for less than policy limits. *Id.*

438

also crucial to judging whether subrogation can be maintained. Full participation in settlement and the hearing, combined with a finding that the insured is less than whole, shifts the equitable balance away from the insurer. *Id.* at 636. Finally, the *Schulte* court attempted to lay out a step-by-step procedure to determine the insurer's subrogation rights when the insured settles first.[11]

■■■■■■■

¶ 60. There are several lessons we can take from the cases following *Garrity* and *Rimes* that are helpful in resolving the Mullers' case. First, the made whole doctrine is not applicable in all situations, and thus the test of "wholeness" stated in *Rimes* is not the sole criterion for determining whether an insurer may pursue its subrogation interest. *See Blue Cross,* 140 Wis. 2d at 550. Second, the made whole doctrine, as stated in *Garrity* and *Rimes,* does not apply when the inequitable

---

[11] We later summarized this settlement procedure in *Petta v. ABC Ins. Co.,* 2005 WI 18, 278 Wis. 2d 251, 692 N.W.2d 639:

> [The *Schulte* settlement procedure] requires the plaintiff to (1) settle with the tortfeasor without resolving the subrogated insurer's claim; (2) request a *Rimes* hearing to determine if the settlement made the insured whole; and (3) provide the insurer an opportunity to participate in that hearing. If the circuit court determines that the settlement did not make the settling plaintiff whole, then the insurer's subrogation rights are extinguished.

*Id.,* ¶ 29 (internal citations omitted).

Although the three-step procedure outlined in *Petta* is straightforward, this summary is an oversimplification. Neither *Schulte* nor *Petta* provide guidance with regard to the impact of the insured settling for less than policy limits in step (1), or the weight of this factor in steps (2) and (3). This equitable factor should not be ignored and is a factor we are now pressed to evaluate in the instant case.

prospect of an insurer competing with its own insured for limited settlement funds is absent. *Mutual Service,* 140 Wis. 2d at 563–64. Third, the existence of an indemnification agreement between the plaintiff and tortfeasor indirectly creates a limited pool of settlement funds between the plaintiff and his insurer. *See Schulte,* 176 Wis. 2d at 634. Finally, subrogation rests on several equitable principles including, but not limited to: (1) ensuring that the plaintiff is fully compensated for loss; (2) preventing unjust enrichment; and (3) ensuring that the wrongdoer is held responsible for his conduct and not allowed to go scot-free by failing to respond to damages while another, the plaintiff's insurer, is required to do so. *Vogt,* 129 Wis. 2d at 13.

¶ 61. Following *Schulte,* our decisions in *Sorge v. National Car Rental System, Inc.,* 182 Wis. 2d 52, 512 N.W.2d 505 (1994), and *Ives v. Coopertools,* 208 Wis. 2d 55, 559 N.W.2d 571 (1997) (per curiam), dealt with the issue of the applicability of the made whole doctrine when the insured plaintiff was contributorily negligent, thereby eliminating entitlement to full "made whole" damages. Contributory negligence is not at issue in the Mullers' case, so these cases have little impact on our analysis.

¶ 62. However, one of the concurring opinions in *Ives,* a 3–3 decision with no precedential value, does offer some analysis on point. Justice Donald W. Steinmetz's concurrence in *Ives* cautioned against placing the keys to the insurer's subrogation rights solely in the settling insured's hands. *See id.* at 89–90 (Steinmetz, J., concurring). The opinion notes that a made whole doctrine premised upon *only* a literal definition of "wholeness," i.e., that the plaintiff must be fully reimbursed for all losses before the insured may pursue subrogation, would have two effects: (1) "the injured plaintiff can settle with

the alleged tortfeasors, thereby extinguishing the subrogated insurer's right of action against the tortfeasor," *id.* at 89–90 (citing *Schulte,* 176 Wis. 2d at 634–35); and (2) "the plaintiff can settle with the tortfeasor for a little less than his or her total damages and then claim to have not been made whole or compensated for all of the elements of damages." *Id.* at 90 (citing *Rimes,* 106 Wis. 2d at 275).

¶ 63. Unlike the preceding cases, *Ruckel v. Gassner* did not involve a settlement between a plaintiff and a tortfeasor, or between the plaintiff's insurer and the tortfeasor. The case is important, however, because it clarified that the common law made whole doctrine cannot be circumvented by contract. *Ruckel,* 253 Wis. 2d 280, ¶¶ 4, 40–43. *Ruckel* did not address a situation in which the insured's being made whole is not a condition precedent to the insurer's right to seek subrogation.

¶ 64. *Paulson v. Allstate Insurance Company,* 2003 WI 99, 263 Wis. 2d 520, 665 N.W.2d 744, followed on the heels of *Ruckel.* The facts of *Paulson* involved several settlements between a plaintiff (Paulson) injured in a car collision, her auto insurer (Midwest), the tortfeasor, and the tortfeasor's liability insurer. *Id.,* ¶ 2. Paulson argued that the damages she recovered from her insurer did not accurately reflect the extent of total property damages to her vehicle. *Id.,* ¶ 9. Paulson was estimated to be 30 percent comparatively negligent in the accident when her insurer settled with the tortfeasor's insurer. *Id.,* ¶ 6.

¶ 65. The question presented was "whether Paulson may recover the amount of money representing the difference between the amount Paulson's insurer paid [$7,042.44, for car repairs, pursuant to Paulson's insurance contract] and what her insurer settled for in negotiations with the tortfeasor's insurer upon its sub-

441

rogation claim [$4,929.71, reflecting a 70–30 split of the indemnity to account for Paulson's contributory negligence]." *Id.*, ¶ 18. We answered that question "no" and found that allowing Paulson to recover the difference between these sums would result in a double recovery. *Id.*

¶ 66. We rejected Paulson's argument that the made whole doctrine of *Garrity* and *Rimes* applied to her claim. We distinguished these precedents on grounds that, unlike Paulson's case, the facts of those cases "deal[t] with the situation of competition between an insured and his or her insurer for a limited pool of money." *Id.*, ¶ 23 (citing *Schulte,* 176 Wis. 2d at 631–32). We concluded that the title of a University of Chicago Law Review article by Jeffrey A. Greenblatt, *When the Pie Isn't Big Enough, Who Eats Last?,* 64 U. Chi. L. Rev. 1337 (1997), "illustrates the exact situation in which we find that the *Rimes/Garrity* cases apply; [however,] if there is no doubt that the 'pie' is big enough, we find that the *Rimes/Garrity* issue does not arise." *Id.*, ¶ 26 n.3. There had been no "specter of an insurer competing with the insured for a limited amount of funds" because there was "no discussion of policy limits or a limited pool of funds for which Midwest and Paulson [were] competing." *Id.*, ¶ 27.

¶ 67. The final case for discussion is *Petta v. ABC Insurance Co. Petta* involved a wrongful death claim in which the court applied the made whole doctrine outside the confines of the insurer/insured relationship. *Id.*, ¶ 13. In *Petta,* the subrogation right of the subrogee was not premised upon an insurance contract but upon the common law principle of "legal (equitable)" subrogation. *Id.*, ¶ 26 n.14. These facts distinguish *Petta* from the Mullers' case, where a contractual right to subrogation existed.

¶ 68. *Petta* emphasized that subrogation rests upon equitable principles. *See id.*, ¶ 27, n.15 (quoting cases). As noted in footnote 11 above, the *Petta* court also summarized the three-step settlement procedure plaintiffs are to use to determine the respective rights of insured and insurer in light of the made whole doctrine. *Petta*, 278 Wis. 2d 251, ¶ 29 (citing *Schulte*, 176 Wis. 2d at 637).

¶ 69. Against this background, we will attempt to apply our precedents to this case. The *Petta* court's emphasis on the equitable principles behind subrogation influences us to home in on the unique facts and timing of the settlements. *See Petta*, 278 Wis. 2d 251, ¶ 27. We also find it necessary to clarify the impact that the tortfeasor's policy limits have on the applicability of the made whole doctrine when the plaintiff settles, a factor not alluded to in the settlement procedure outlined in *Petta. Id.*, ¶ 29.

¶ 70. The Mullers had property that was destroyed by fire, resulting in a claimed loss of $697,981.58. They turned to their property insurer, Society, and Society paid $407,378.88 to the Mullers, which was every dollar they were entitled to under their insurance policy. The Mullers could have purchased more casualty insurance to protect themselves against loss. Here, they *settled* a claim with their insurance agent for his alleged failure to increase their insurance coverage. In any event, Society itself fulfilled every contractual obligation it had to the Mullers.

¶ 71. Society had a subrogation provision in the insurance contract. Part of the Mullers' claim was "assigned" to Society after Society fulfilled its obligations under the insurance contract. *See Heifetz*, 61 Wis. 2d at 120; *Garrity*, 77 Wis. 2d at 546.

443

¶ 72. Society was entitled to act on its subrogation rights so long as it recognized the priority of its insured to compete for available funds. *See Garrity,* 77 Wis. 2d at 543. If there were an insufficient pool of funds, so that the Mullers could not have satisfied their claim, then Society would have been out of luck. Under those circumstances, the made whole doctrine would have applied in full force.

¶ 73. If Society had agreed to limit the pool of available funds, it could not have proceeded against its insured to take part of their settlement unless the insured was made whole. *Rimes,* 106 Wis. 2d at 272.

¶ 74. The import of *Schulte* is that an insured can negotiate an indemnification agreement with the tortfeasors as part of a settlement. *Schulte,* 176 Wis. 2d at 634–35. It can negotiate that agreement without the approval of the insurer because the court has recognized that a tortfeasor and a tortfeasor's insurer will always attempt to limit damages and will be more willing to settle with the insured if they can eliminate the subrogee's rights. *Id.* at 634. *An indemnification agreement limits available funds.* If the insured is not made whole by a settlement that includes an indemnification agreement, the insured has claimed the available pool, and again the insurer is out of luck.

¶ 75. To date this court has set no conditions on an insured's agreement to a settlement that effectively extinguishes the rights of the subrogee insurer. This means that to date we have not explicitly addressed a situation where an insured has voluntarily signed an indemnification agreement with the tortfeasor without being made whole, even though there were ample funds available to satisfy the claim. This contingency is disturbing because it could permit the tortfeasor to escape full liability while it extinguished the contractual rights

of the subrogee without the subrogee's consent, or, possibly, even the subrogee's knowledge.

¶ 76. The present case does not involve an indemnification agreement. Consequently, the insurer is free to exercise its subrogation rights against the tortfeasor.

¶ 77. There is no dispute that Jerrick's liability policy with United had a $1,000,000 limit, which was more than sufficient to satisfy the independent claims of the Mullers and Society.[12] Where policy limits are sufficient to cover all related claims, the insured cannot settle for less than policy limits and then argue that "the pie was not big enough" to make him whole. *See Paulson,* 263 Wis. 2d 520, ¶ 26 n.3. The made whole doctrine simply does not apply in these circumstances, inasmuch as the inequitable prospect of an insurer competing with its insured for a limited pool of funds is not present. *Id.; see also Mutual Service,* 140 Wis. 2d at 563–64; *Schulte,* 176 Wis. 2d at 631–32.

¶ 78. The Mullers settled with the tortfeasor, and their right to priority was preserved. *See Garrity,* 77 Wis. 2d at 541. Their settlement avoided both the cost of further litigation and any concerns they may have had about proving Jerrick's liability or the amount of their property damages. The Mullers got their money promptly without having to take the risk of going to a jury. It would be inequitable now to allow them to reap the benefits of their settlement and then try to capture

---

[12] One treatise notes that "the question of the tortfeasor's ability to pay" may cause an insured to settle for less than an amount necessary to make him whole. 2 Allan D. Windt, *Insurance Claims & Disputes* § 10:6, at 10–32 (5th ed. 2007). This observation is apt, but in the Mullers' case there is no question of Jerrick's ability to pay because his liability policy limit of $1,000,000 was more than sufficient to satisfy all claims.

all or part of Society's settlement, in view of the fact that the Mullers were permitted to settle first.

¶ 79.  The Mullers disagree, contending that "psychological factors" were in play here, thereby limiting the pool of available settlement funds to $310,000. This argument is based on Society's tentative, unwritten agreement to settle with United for $190,000 before the Mullers reached their $120,000 settlement agreement.[13]

¶ 80.  In this case, the tortfeasor's liability limits were $1,000,000. United *tentatively* agreed to reimburse Society $190,000, leaving liability limits of $810,000. The Mullers claimed total damages of $697,951.58. They had already received payment of $407,378.88 from Society. If they had demanded a payment of $500,000 and offered an indemnity agreement, they would have been made whole (recovering their $290,602.70 unreimbursed loss), and they would have captured about the same subrogation money for their insurer (approximately $210,000, less expenses) as the insurer negotiated for itself.[14]

¶ 81.  In addition to an indemnity agreement, the law gives plaintiffs tools to effect this sort of settlement.

---

[13] We agree with the non-party brief for Wisconsin Insurance Alliance, Property Casualty Insurers Association of America, Civil Trial Council of Wisconsin, and the National Association of Subrogation Professionals when it stated that "[t]here simply was nothing wrong with Society attempting to reach a resolution of its subrogation claim while the Mullers did the same with their primary claim." This is true since subrogated insurers have the right to actively participate in litigation with an "equal voice" where their subrogation interests are implicated. Wis. Stat. §§ 803.03(2)(a), (2)(b)2.

[14] If the Mullers could not prove liability for $697,981.58, then their proof problems put the case in a different light.

*See* Wis. Stat. § 628.46, as interpreted in *Kontowicz v. American Standard Ins. Co. of Wis.*, 2006 WI48, 290 Wis. 2d 302, 714 N.W.2d 105, and Wis. Stat. §§ 807.01(3) and (4) (providing for double the amount of taxable costs and 12 percent interest, respectively, when an offer of settlement is rejected and a judgment larger than that settlement is awarded to the plaintiff). Plaintiffs, therefore, hold both a carrot and a stick.

¶ 82.  Psychology does play a part in settlement negotiations. *See Schulte,* 176 Wis. 2d at 633. A party cannot go into settlement negotiations waving a white flag and expect to emerge a victor.

¶ 83.  We have no record of the settlement negotiations. However, the Mullers' attorney's March 28, 2003, letter to all parties signaled the Mullers' reluctance to proceed to trial. The letter reads in part:

> This case is set for trial on May 19, 2003. I am writing on behalf of all the parties to advise the Court of recent developments that we believe impact upon the current scheduling order. . . .
>
> First, since Society and plaintiffs Muller had been sharing both the cost of litigation and the workload in preparing the case for trial, [counsel for Society]'s withdrawal means that my co-counsel . . . and I will be solely responsible for the entirety of the trial, whereas before, pursuant to tacit agreement with [counsel for Society], we were mainly handling the damages aspect of the case. This basically doubles the strain on both our financial and personnel resources, with less than six weeks remaining before trial. Second, the unexpected settlement, which raises complex issues under *Rimes* and its progeny, renders an overall resolution of this case more likely than before. To put it simply, Society's absence from the case renders it much easier to arrive at a settlement, at least from the plaintiffs' standpoint. Because of this "sea-change," the parties

have been expending most of their recent effort toward settlement, rather than toward litigation. . . . Third, and finally, there were unfortunately some basic miscommunications at the mediation held on March 4, 2003, which may have prevented a global settlement at that time. The parties now believe, with Society Insurance and its subrogated interest out of the case, that another round of mediation, whether formal or informal, might very well resolve the case as between the two remaining defendants and the Mullers, which would leave the Mullers free to pursue any claims they might have against Society under the *Rimes* doctrine.

¶ 84. This letter reveals that the Mullers were not willing to pull their own weight in litigation. They expected to ride free on the labors of their insurer. They expected to skim off the first $170,000, or at least $59,725.60, of any settlement made by their insurer.

¶ 85. We are unable to adopt the Mullers' position on these facts. It is too speculative, and it is inequitable. It would completely change the dynamics of settlement negotiations, rewrite insurance contracts, and increase the likelihood that tortfeasors will escape their responsibilities.

¶ 86. The court of appeals observed that "had Society chose[n] not to pursue its subrogation claim against Jerrick and United, the Mullers would not be able to recover any more monies." *Muller,* 300 Wis. 2d 463, ¶ 18. We agree. If Society had (1) removed itself from the case entirely after the Mullers entered their $120,000 settlement; or (2) pursued its claim to trial and lost, the Mullers would have been left with their $120,000 settlement and no remaining right to pursue recompense against Society, Jerrick, or United. Allowing the Mullers to benefit from Society's subsequent $190,000 settlement with Jerrick and United, when the

Mullers were unable or unwilling to secure an amount necessary to satisfy their claim in their own settlement, would be unfair to Society and would discourage subrogees from pursuing their subrogation rights.

## IV. CONCLUSION

¶ 87.  We hold that the made whole doctrine is not implicated in this case. Specifically, the doctrine does not apply when an insurer has fully satisfied its obligations under an insurance contract, given its insureds the opportunity to settle their claim with the tortfeasor and the tortfeasor's insurer, the pool of settlement funds available to the insureds exceeds the total claims of both the insureds and the insurer, and the insureds settle their claim, even though the insureds' settlement, together with the insurer's policy payments, does not satisfy the insureds' total claim. In these circumstances, the inequitable prospect of an insurer competing with its insureds for an inadequate pool of funds is not present, and the equities favor the insurer. Thus, we conclude that Society is entitled to retain its entire subrogation settlement with Jerrick and United and that the Mullers have no right to a portion of Society's subrogation settlement. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 88.  SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). **Here is the issue:** Did the circuit court err in requiring Society Insurance to pay the Mullers their $59,725.60 unreimbursed loss before retaining the rest of its settlement with the tortfeasor's liability insurance company? My answer is No.

¶ 89.  ***Here are the facts:*** A fire destroyed the Mullers' sporting goods store. Society Insurance, the Mullers' insurance company, paid the Mullers their policy limit under the fire policy of $407,378.88. The Mullers' damages exceeded this sum, and the Mullers sought to collect additional funds from an alleged tortfeasor and his insurance company, hereinafter referred to collectively as the tortfeasor's insurance company.

¶ 90.  Society Insurance also pursued its subrogation claim against the tortfeasor's insurance company.[1] The Mullers and Society Insurance initially worked together in pursuing their claims against the tortfeasor's insurance company but, for reasons unclear from the record, settled their claims separately with the tortfeasor's insurance company.

¶ 91.  Before the Mullers settled with the tortfeasor's insurance company, Society Insurance reached a "tentative" settlement with the tortfeasor's insurance company, pending resolution of the Mullers' claim. The terms of this tentative settlement apparently were not known to the Mullers.

¶ 92.  After Society Insurance made its "tentative" deal with the tortfeasor's insurance company, the Mullers settled with the tortfeasor's insurance company for $120,000. Thereafter Society Insurance "finalized" its "tentative" settlement of its own subrogation rights with the tortfeasor's insurance company for $190,000.

---

[1] "[O]n paying a loss, an insurer is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss, such that the insurer is entitled to bring an action against this third party whose negligent or other tortious or wrongful conduct caused the loss, regardless of whether the insurer would have been entitled to bring such an action in its own right." 16 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance,* § 222:5 (3d ed. 2005) (footnotes omitted).

¶ 93. Although the tortfeasor's liability policy had a limit of $1,000,000, neither Society Insurance nor the Mullers were able to recover in full from the tortfeasor's insurance company. The Mullers and Society Insurance stipulated in mediation that the Mullers' settlement of $120,000, when added to Society Insurance's payments to the Mullers, left the Mullers with an unreimbursed loss of $59,725.60.

¶ 94. The circuit court found that the tortfeasor's insurance company was prepared to pay only $310,000 (the total sum of the Mullers' and Society Insurance's settlement awards) to settle both the Mullers' and Society Insurance's claims against the tortfeasor. The circuit court held that the Mullers and Society Insurance were in competition for this limited pool of $310,000. Applying the made whole doctrine, the circuit court concluded that Society Insurance had to make the Mullers whole. The circuit court required Society Insurance to pay the Mullers their $59,725.60 unreimbursed loss out of the proceeds of Society Insurance's $190,000 settlement with the tortfeasor's insurance company.

¶ 95. *Here is the law on the doctrine of subrogation and the made whole doctrine :* Many cases over a long time have interpreted the doctrine of subrogation and the made whole doctrine in a great variety of fact situations. The case law is not easy to follow, but certain principles are very clear: Subrogation and the made whole doctrine are equitable doctrines. An insured must be made whole before the insurer may recover based on its subrogation claim. Subrogated insurance companies should not compete with their insureds for limited settlement funds.[2]

---

[2] *Paulson v. Allstate Ins. Co.,* 2003 WI 99, ¶ 27, 263 Wis. 2d 520, 665 N.W.2d 744.

¶ 96. This court has declared that "the cause of action (against the tort-feasor) is indivisible and the owner of the policy should be first to make good his own loss; where either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume. . . . [T]here is no subrogation until the insured has been made whole."[3]

¶ 97. Writing for a unanimous court, Justice Prosser stated the Wisconsin law on subrogation as follows: "Ordinarily, subrogation does not arise until . . . the insured's loss has been fully paid. . . . [T]he burden of loss should rest on the party paid to assume the risk, and not on the inadequately compensated insured. . . . [U]nder basic principles of subrogation . . . the insurer is not entitled to recoup anything until the insured has been made whole. . . . Subrogation in [circumstances where the insured had not been made whole] . . . would turn 'the entire doctrine of subrogation on its head.' "[4]

¶ 98. The insured and the subrogated insurance company cannot override by contract the equitable principles of subrogation and the made whole doctrine. When faced with the question whether parties to an insurance contract may override or negate the made whole doctrine by writing specific, unambiguous con-

---

[3] *Garrity v. Rural Mut. Ins. Co.,* 77 Wis. 2d 537, 542, 253 N.W.2d 512 (1977).

[4] *Ruckel v. Gassner,* 2002 WI 67, ¶¶ 16, 17, 27, 41, 253 Wis. 2d 280, 646 N.W.2d 11 (citations omitted). *See also Drinkwater v. Am. Family Mut. Ins. Co.,* 2006 WI 56, ¶¶ 20–23, 290 Wis. 2d 642, 714 N.W.2d 568 (quoting *Ruckel* with approval).

In Wisconsin the "insurer may not recover from a tortfeasor until the insured has been made whole." Jeffrey A. Greenblatt, *Insurance and Subrogation: When the Pie Isn't Big Enough, Who Eats Last?,* 64 U. Chi. L. Rev. 1337, 1342 (1997).

tractual language stating that the insurer's rights to subrogation are superior to the insured's right to be made whole, the court (with Justice Prosser writing) unanimously answered No![5]

¶ 99.    The circuit court's judgment in the present case is consistent with this case law, with the equitable principles stated therein, and with sound public policy. The majority opinion is not. I therefore dissent.

¶ 100.    *Here is my reasoning:*

¶ 101.    (I) I agree with the circuit court's reasoning, which rests on case law and equitable principles. The *Schulte*[6] and *Petta*[7] cases, as well as the equitable principles that are the basis of both the made whole doctrine and the doctrine of subrogation,[8] support the circuit court's judgment requiring Society Insurance to pay the Mullers their unreimbursed loss before retaining the rest of its settlement with the tortfeasor's insurance company.

¶ 102.    (II) The premises upon which the majority opinion decides the present case are incorrect. The majority opinion rests on two central premises:

¶ 103.    The first (and primary) premise is that the made whole doctrine applies only when the tortfeasor's policy limits are less than the total damages the victim suffers. In the words of the majority opinion, "Where

---

[5] *Ruckel,* 253 Wis. 2d 280, ¶¶ 2, 4.

[6] *Schulte v. Frazin,* 176 Wis. 2d 622, 500 N.W.2d 305 (1993).

[7] *Petta v. ABC Ins. Co.,* 2005 WI 18, 278 Wis. 2d 251, 692 N.W.2d 639.

[8] "Subrogation rests upon the equitable principle that one, other than a volunteer, who pays for the wrong of another should be permitted to look to the wrongdoer to the extent he has paid and be subject to the defenses of the wrongdoer." *Garrity,* 77 Wis. 2d at 541.

policy limits are sufficient to cover all related claims . . . [t]he made whole doctrine simply does not apply . . . inasmuch as the inequitable prospect of an insurer competing with its insured for a limited pool of funds is not present."[9]

¶ 104.  The second premise, which serves as support for the first, is that the tortfeasor's insurance company in the present case would have been prepared to pay any amount up to the tortfeasor's policy limit of $1,000,000 in order to settle the Mullers' and Society Insurance's claims against the tortfeasor's insurance company. With this premise firmly in mind, the majority opinion concludes that the pool of settlement funds available to the Mullers was the tortfeasor's $1,000,000 policy limit, not the $310,000 that the tortfeasor's insurance company actually paid to settle the Mullers' and Society Insurance's claims. The majority opinion concludes that the Mullers may blame only themselves, not any competition provided by Society Insurance, for their failure to be compensated fully in their settlement with the tortfeasor's insurance company.

¶ 105.  Both premises are factually unsupported and contrary to this court's case law. The circuit court got it right: "In this case, the limited pool became $310,000. . . . Pursuant to *Rimes* and its well established principles, Society is not entitled to retain any of those funds unless and until the plaintiffs have been 'made whole'."

¶ 106.  In contrast to the majority opinion, this court has often explicitly recognized that given the realities of settlements, settling plaintiffs and subrogated insurers compete in a practical sense for limited settlement funds. "[S]ettlement funds may be either

---

[9] Majority op., ¶ 77.

practically or psychologically limited. . . . The practical competition between an insured and the subrogated insurer is an equitable factor we cannot ignore."[10]

¶ 107. Here that competition is clear. Society Insurance was an adversary of the Mullers, competing with the Mullers for the limited funds that the tortfeasor's insurance company was prepared to pay to settle the Mullers' and Society Insurance's claims against it.

¶ 108. (III) The majority opinion contravenes sound public policy by effectively requiring a plaintiff in the Mullers' position to structure his or her settlement agreement to include a clause indemnifying the tortfeasor and the tortfeasor's insurance company against any claim brought by the plaintiff's subrogated insurance carrier.

I

¶ 109. The *Schulte* and *Petta* cases, as well as the equitable principles underlying the doctrine of subrogation and the made whole doctrine, support the circuit court's judgment requiring Society Insurance to pay the Mullers their unreimbursed loss before retaining the rest of its settlement with the tortfeasor's insurance company.

¶ 110. The made whole doctrine is "the general rule that there is no subrogation until the insured has been made whole."[11] The made whole doctrine exists to

[10] *Schulte,* 176 Wis. 2d at 633.

[11] *Garrity,* 77 Wis. 2d at 542.

*Garrity,* a seminal case on the made whole doctrine, also involved a fire loss and fire insurance. *See Garrity,* 77 Wis. 2d at 539.

combat "the inequitable prospect of [an insurer] competing with [its insured] for funds which indisputably fail to make the [insured] whole."[12] It rests upon the equitable principle that "[w]here either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume."[13] The more general doctrine of subrogation, whether conventional subrogation or legal subrogation, is also applied according to the rule of equity.[14]

¶ 111. Applying the made whole doctrine, this court has outlined a three-step "settlement procedure plaintiffs [are] to utilize to determine how a settlement impact[s] an insurer's subrogation rights."[15] The key cases in which this settlement procedure is set forth are *Schulte v. Frazin,* 176 Wis. 2d 622, 500 N.W.2d 305 (1993), and *Petta v. ABC Ins. Co.,* 2005 WI 18, 278 Wis. 2d 251, 692 N.W.2d 639. The present case is a *Schulte/Petta* case.

¶ 112. The *Schulte/Petta* procedure requires the following three steps: (1) The plaintiff-insured settles with the tortfeasor and the tortfeasor's insurance company without resolving the subrogated insurer's part of the claim; (2) The settling parties ask the circuit court to determine whether the injured party has been made whole; and (3) The subrogated insurer has an opportunity to participate in the hearing (commonly called a *Rimes* hearing) that the circuit court holds to decide

---

[12] *Schulte,* 176 Wis. 2d at 625.

[13] *Rimes v. State Farm Mut. Auto. Ins. Co.,* 106 Wis. 2d 263, 276, 316 N.W.2d 348 (1982) (quoting *Garrity,* 77 Wis. 2d at 542).

[14] *Rimes,* 106 Wis. 2d at 270–71.

[15] *Petta,* 278 Wis. 2d 251, ¶ 29.

whether the injured party has been made whole.[16] If the circuit court determines at the *Rimes* hearing that the settlement does not make the plaintiff whole, then the subrogated insurer has no right of subrogation.[17]

¶ 113.    The *Schulte/Petta* procedure implicitly requires the insured to settle its claim before the subrogated insurance company settles its claim. This order fits the court's rule that "the cause of action (against the tort-feasor) is indivisible and the owner of the policy should be first to make good his own loss . . . ."[18]

¶ 114.    The Mullers and the circuit court followed the three-step *Schulte/Petta* procedure. The Mullers settled with the tortfeasor and the tortfeasor's insurance company without resolving Society Insurance's part of the claim. In *Schulte* and *Petta,* the plaintiff-victim agreed to indemnify the tortfeasor against any liability to the subrogated insurance company. In the instant case the Mullers and the tortfeasor's liability insurance company did not include this type of "indem-

---

[16] *Schulte,* 176 Wis. 2d at 637; *Petta,* 278 Wis. 2d 251, ¶ 29.

[17] *Schulte,* 176 Wis. 2d at 637; *Petta,* 278 Wis. 2d 251, ¶ 29.

When the settling parties do not ask the circuit court to determine whether the injured party has been made whole, thus preventing the circuit court from making a finding on the issue, the subrogated insurer's right of subrogation is not extinguished. *See Mut. Serv. Cas. Co. v. Am. Family Mut. Ins. Co.,* 140 Wis. 2d 555, 563–64, 410 N.W.2d 582 (1987) (stating that the made whole doctrine is not "applicable in an action brought by a subrogated insurer against the tortfeasor or the tortfeasor's insurer where the subrogated insurer's insured has previously settled with the tortfeasor."); *Schulte,* 176 Wis. 2d 635–36 (holding that the rule stated in *Mutual Service* does not apply when the settling parties request a *Rimes* hearing, the subrogated insurer has an opportunity to participate in the hearing, and the circuit court determines that the injured party has not been made whole).

[18] *Garrity,* 77 Wis. 2d at 542.

nification agreement."[19] In any event the subrogated insurance company's (Society Insurance's) part of the claim was not resolved, and Society Insurance's subrogated right was protected.

¶ 115.   The settling parties, the Mullers and the tortfeasor's insurance company, asked the circuit court to determine whether the injured party had been made whole. Society Insurance objected to the hearing. The circuit court decided that the Mullers were entitled to a hearing to determine whether they had been made whole. Thus the *Schulte/Petta* three-step procedure was followed in the present case.

¶ 116.   The Mullers and Society Insurance waived the *Rimes* hearing, stipulating that the Mullers' settlement with the tortfeasor and his insurer left the Mullers with an uncompensated loss of $59,725.60. The circuit court then determined upon the parties' stipulation that the Mullers had not been made whole and that Society Insurance consequently could claim no right of subrogation.

¶ 117.   If any party disregarded the *Schulte/Petta* procedure in the present case, it was Society Insurance. At the same time as the Mullers were negotiating with the tortfeasor's insurance company, Society Insurance was engaging in its own negotiations. It chose to settle its subrogation claim against the tortfeasor's insurance company tentatively before the Mullers reached their settlement and before permitting the circuit court an opportunity to determine whether Society Insurance could claim a right of subrogation in the first place. In settling its claim in this manner, Society Insurance assumed the risk that it would need to hand over some

---

[19] *See Schulte,* 176 Wis. 2d at 633; *Petta,* 278 Wis. 2d 251, ¶¶ 29, 35, 42.

portion of its settlement award to the Mullers in order to make the Mullers whole.

¶ 118. To be sure, the bottom line in the present case must accord with equitable considerations, not the black letter of this court's decisions in *Schulte* or *Petta*. "The doctrine of subrogation is based upon equitable principles,"[20] and "[e]quity does not lend itself to the application of black letter rules."[21]

¶ 119. I agree with the majority opinion that the equitable doctrine of subrogation exists (1) to ensure that the plaintiff is fully compensated for loss; (2) to prevent unjust enrichment; and (3) to ensure that the wrongdoer is held responsible for his conduct and not allowed to go scot-free by failing to respond to damages while the plaintiff's insurer is required to do so.[22]

¶ 120. The first equitable principle obviously weighs in favor of affirming the circuit's judgment requiring Society to pay the Mullers their $59,725.60 uncompensated loss.

¶ 121. The second and third equitable principles have no application to the present case. The circuit court's judgment did not overcompensate the Mullers for their loss and thus did not result in unjust enrichment.[23] In addition, the circuit court's judgment of

[20] *Schulte,* 176 Wis. 2d at 628 (citing *Rimes,* 106 Wis. 2d at 271). *See also Petta,* 278 Wis. 2d 251, ¶ 27.

[21] *Schulte,* 176 Wis. 2d at 628 (quoting *Vogt v. Schroeder,* 129 Wis. 2d 3, 12, 383 Wis. 2d 876 (1986)). *See also Petta,* 278 Wis. 2d 251, ¶ 34.

[22] *See* majority op., ¶ 60.

[23] *See* majority op., ¶ 23 ("Once an insured has been fully compensated for his loss, any additional recovery by the insured would constitute unjust enrichment.") (citing *Couch on Insurance,* § 223:133).

course did not require Society Insurance to send any of its settlement proceeds back to the tortfeasor or the tortfeasor's insurance company.

¶ 122. The circuit court's judgment in the present case was precisely what the equitable principles required. The judgment made the Mullers whole and permitted Society Insurance to retain the $130,274.40 that was left of its $190,000 settlement with the tortfeasor's insurance company. The injured Mullers were given priority over their insurance company.[24] Society Insurance, the Mullers' insurance company, was given priority over the tortfeasor and the tortfeasor's insurance company.

¶ 123. Applying *Schulte* and *Petta,* as well as the equitable principles underlying the made whole doctrine and the doctrine of subrogation, I would affirm the circuit court's judgment requiring Society Insurance to pay the Mullers their unreimbursed loss before retaining the rest of its settlement with the tortfeasor's insurance company. At the same time as the Mullers were negotiating with the tortfeasor's insurance company for payment, Society Insurance was trying to cut its own deal with the tortfeasor's insurance company. Society Insurance was in direct competition with its insured for the limited amount of money the tortfeasor's insurance company was prepared to pay. The issue in the instant case is whether there was competition between the Mullers and Society Insurance for the limited funds from the tortfeasor's insurance company. There was. The reality of settlements and competition between an insured and insurer are equitable factors that the court has considered very important in past cases.

---

[24] *See* majority op., ¶ 28 ("[T]he insured has priority over his insurer when there is an inadequate pool of funds.").

## II

¶ 124. In contrast to the circuit court's well-reasoned decision, the majority opinion decides the present case on the incorrect premise of law that the made whole doctrine does not apply when the tortfeasor's policy limits are, as in the present case, greater than the total damages the victim suffers.[25]

¶ 125. This incorrect premise of law rests on an equally incorrect premise of fact. The majority opinion assumes that the tortfeasor's liability insurance company would have been prepared to pay much more than the $310,000 it actually paid to settle the Mullers' and Society Insurance's claims. Indeed, the majority opinion blithely concludes that the tortfeasor's insurance company would have been prepared to pay any amount not exceeding the tortfeasor's policy limit of $1,000,000. According to the majority opinion, the Mullers were unable to obtain more money from the tortfeasor's insurance company only because the Mullers went into settlement negotiations "waving a white flag" and because they were "not willing to pull their own weight in litigation."[26] According to the majority opinion, the inequitable prospect of an insurer competing with its insured for a limited pool of funds is not present in this case.[27]

¶ 126. The majority opinion's tale about the parties' settlement negotiations makes little sense. The $310,000 that the tortfeasor's insurer agreed to pay is the sole available estimate of the amount that the tortfeasor's liability insurance company was prepared to pay to settle the Mullers' and Society Insurance's

---

[25] Majority op., ¶ 76.

[26] Majority op., ¶¶ 82, 84.

[27] Majority op., ¶ 76.

claims against the tortfeasor. The tortfeasor's $1,000,000 policy limit is not an estimate of the amount the insurer was prepared to pay to settle the Mullers' and Society Insurance's claims, as the majority opinion states. The policy limit represents only the maximum that the insurer would have ordinarily been required to pay under the law. A defendant insurer's decision whether to settle (and for how much) is based on calculations far more complex than a simple comparison of the plaintiff's request to the tortfeasor's policy limit.

¶ 127. Indeed, the facts show that Society Insurance—whom the majority opinion does not accuse of waving a white flag—apparently fared worse in settlement negotiations with the tortfeasor's insurance company than the Mullers did. The Mullers fell only $59,725.60 short of full compensation for their loss. Society Insurance settled for $217,378.88 less than the full value of its $407,378.88 subrogation claim against the tortfeasor's insurance company. Given the lack of any criticism directed at Society Insurance, the majority opinion's caustic remarks about the Mullers are simply baffling. The majority opinion has no cause to conclude that the Mullers' efforts were less than vigilant.

¶ 128. The simple truth is that we have no idea why the Mullers and Society Insurance were collectively unable to get more than $310,000 from the tortfeasor's insurance company. Perhaps the amount of the Mullers' damages was uncertain.[28] Or perhaps it was uncertain whether the Mullers could prove the tortfeasor's liabil-

[28] Although the majority opinion assumes (at ¶ 40) that "the value of the plaintiff's property loss was largely undisputed," the basis of this assumption is unclear. The parties required mediation to resolve the issue of damages. Furthermore, the Mullers initially claimed a loss of $697,981.58 and accordingly argued before the circuit court that they were entitled to recover an unreimbursed loss of $170,602.70 from

ity for their damages. In any case, the bottom line is the same: The tortfeasor's insurance company agreed to pay only $310,000 to settle the Mullers' and Society Insurance's claims against the tortfeasor, and the Mullers and Society Insurance were necessarily in competition over this limited pool of funds.

¶ 129. The majority opinion's narrow focus on the tortfeasor's policy limits not only flies in the face of the facts but also flies in the face of this court's precedent. The court has repeatedly stated that "[g]iven the realities of settlements, settling plaintiffs and subrogated insurers usually compete in a practical sense for limited settlement funds. Settling defendants typically have limited policy limits and assets and typically want to pay as little as possible. . . . The practical competition between an insured and the subrogated insurer is an equitable factor we cannot ignore."[29]

¶ 130. In the present case, the practical realities are that the Mullers and Society Insurance were in competition for a pool that the tortfeasor's insurance company limited to $310,000, which is less money than

_____

Society Insurance. The parties' stipulation to an unreimbursed loss of $59,725.60 implies that the Mullers agreed in their mediation with Society Insurance to subtract $110,877.10 from their claim for total damages.

[29] *Schulte,* 176 Wis. 2d at 633. *See also Petta,* 278 Wis. 2d 251, ¶¶ 29, 35.

The plaintiff's recovery is constrained by the subrogated insurer's cause of action, because "[a] tortfeasor who wishes to settle must inevitably address the insurer's separate rights in some way." *Schulte,* 176 Wis. 2d at 633 (quotation marks omitted).

The *Schulte* court put the matter concisely: "[W]e question why a defendant would offer as much to settle with only the plaintiff as to settle with both the plaintiff and the subrogated insurer." *Schulte,* 176 Wis. 2d at 633.

was needed both to make the Mullers whole and to repay Society Insurance.

¶ 131. The present case is not the first involving a plaintiff-victim who agreed to settle below the tortfeasor's policy limit. Like the Mullers, the plaintiffs in both *Rimes v. State Farm Mutual Automobile Insurance Co.*, 106 Wis. 2d 263, 316 N.W.2d 348 (1982), and *Schulte* settled for well below the tortfeasor's policy limits. In both cases the court nevertheless applied the made whole rule.

¶ 132. The Rimeses settled for $125,000.[30] The combined policy limits of the tortfeasors were $375,000.[31] The total medical payment made by the subrogated insurance company in *Rimes* was $9,649.90. The sum of $9,649.90 was paid from the settlement amount into the circuit court to be held in escrow pending the outcome of a "trial" to the circuit court concerning the subrogated insurance company's claimed subrogation rights for the medical payment made on behalf of the Rimeses. In *Rimes* no indemnification agreement had been reached between the Rimeses and the tortfeasors; the issue before the circuit court was how much the insurance company should recover from the total settlement under its subrogation rights. This court applied the made whole doctrine in the *Rimes* case, held that the subrogated insurance company could not recover any of the $9,649.90, and did

---

[30] *Rimes,* 106 Wis. 2d at 267.

In *Rimes,* the dissenting opinion stated that the made whole doctrine should not apply because "the plaintiffs voluntarily settled their entire claim for an amount less than the total limits of the available insurance monies . . . ." *Rimes,* 106 Wis. 2d at 280 (Coffey, J., dissenting). The majority opinion rejected the dissent's position.

[31] *Rimes,* 106 Wis. 2d at 267.

not fault the Rimeses for failing to garner a larger settlement award even though they had not tapped the combined policy limits of the tortfeasors.

¶ 133. In *Schulte*, the plaintiffs settled for less than policy limits and agreed to indemnify the tortfeasor for the claims of the subrogated insurance company. Justice Steinmetz wrote in dissent that "[f]or tactical reasons, the plaintiffs settled their claim for less than the defendants' insurance policy limits."[32] The basis of Justice Steinmetz's dissenting opinion was that "[b]ecause the plaintiffs agreed to accept less than the defendants' insurance policy limits, it cannot be said that the plaintiffs have not been made whole."[33] The majority opinion in *Schulte* did not accept Justice Steinmetz's reasoning. The majority opinion in the present case is little more than a repackaging of Justice Steinmetz's dissenting opinion that the six justices in the *Schulte* majority rejected.

¶ 134. The majority opinion's analysis lacks a basis in the facts or the case law. The majority opinion errs in treating the tortfeasor's liability insurance policy limits as the amount that the tortfeasor's insurance company was prepared to pay to settle claims

---

[32] *Schulte*, 176 Wis. 2d at 637–38 (Steinmetz, J., dissenting).

[33] *Id.* at 638 (Steinmetz, J., dissenting).

The dissent in *Schulte* took the same position as the dissent in *Rimes*, namely that the made whole doctrine should not apply because the plaintiffs voluntarily settled their claim for less than the tortfeasor's policy limits.

Although the Schultes settled for well below the tortfeasor's policy limits, the majority opinion inexplicably asserts that *Schulte* provides no guidance on how the three-step *Schulte/Petta* procedure should be applied when the insured settles for less than the tortfeasor's policy limits. Majority op., ¶ 59 n.11.

brought by the plaintiff and the plaintiff's subrogated insurer. The majority opinion errs in failing to recognize that as a practical matter the funds available from the tortfeasor's insurance company were limited to $310,000 and were less than the Mullers' damages, as the circuit court found.

### III

¶ 135. The majority opinion likely will have a troubling effect upon settlements in future cases. As a practical matter, the majority opinion writes a fourth step into the *Schulte/Petta* procedure that plaintiffs are to utilize to determine how a settlement affects an insurer's subrogation rights. The majority opinion effectively requires a plaintiff following the *Schulte/Petta* procedure to structure his or her settlement agreement to include a clause indemnifying the tortfeasor and the tortfeasor's insurance company against any claim brought by the plaintiff's subrogated insurer.

¶ 136. According to the majority opinion, the made whole doctrine would apply in the present case if the Mullers had structured their settlement agreement to include a clause indemnifying the tortfeasor and his insurer against any claim brought by the plaintiff's subrogated insurer. The absence of such an indemnification clause is all that prevents the present case from being on all fours with *Schulte*,[34] in which this court applied the made whole doctrine and determined that the subrogated insurer's right of subrogation had been extinguished. Relying on *Schulte*, the majority opinion

[34] The Schultes' settlement agreement with the tortfeasor and his insurer provided that the Schultes would indemnify the tortfeasor and his insurer for any liability arising from the tortfeasor's conduct. *Schulte*, 176 Wis. 2d at 626–27.

in the present case concludes as follows: "An indemnification agreement limits available funds. If the insured is not made whole by a settlement that includes an indemnification agreement, the insured has claimed the available pool, and . . . the insurer is out of luck."[35]

¶ 137. This requirement of an indemnification provision represents a curious development in our made-whole jurisprudence. Some 20 years ago, this court strongly disfavored agreements obligating the victim-plaintiff to indemnify a defendant-tortfeasor against claims brought by a subrogated insurer. In *Blue Cross & Blue Shield United v. Fireman's Fund Ins. Co.*, 140 Wis. 2d 544, 411 N.W.2d 133 (1987), the court criticized such indemnification agreements as "attempt-[ing] to circumvent an insurer's subrogation rights by placing the responsibility for the tortfeasor's wrong on the victim . . . ."[36] We even suggested that such agreements might be void, declining to "reach the issue of whether . . . indemnification clauses are enforceable between the tortfeasor and the injured party" but noting that "at least one jurisdiction has determined that this type of indemnification agreement is void as against public policy."[37]

¶ 138. *Schulte* overruled the language in *Blue Cross* disapproving of indemnification agreements, on the ground that this language constrained a plaintiff's

[35] Majority op., ¶ 74.

*See also* majority op., ¶ 76 ("The present case does not involve an indemnification agreement. Consequently, the insurer is free to exercise its subrogation rights against the tortfeasor.").

[36] *Blue Cross & Blue Shield United v. Fireman's Fund Ins. Co.*, 140 Wis. 2d 544, 554, 411 N.W.2d 133 (1987).

[37] *Id.* at 554 n.6.

ability to settle with the defendant.[38] The *Schulte* court reasoned that "the injured party should have the right to settle on its own terms" and that "refusing to recognize indemnification agreements could hamper plaintiffs' settlement attempts."[39]

¶ 139.  In the present case, the majority opinion takes an unwarranted step. The majority opinion all but requires the very sort of indemnification agreements that this court initially all but prohibited.

¶ 140.  Our decision in *Schulte* recognizing indemnification agreements properly furthered the policy of promoting settlement. In contrast, the majority opinion's de facto requirement that a plaintiff wanting to take advantage of the made whole doctrine utilize an indemnification agreement constrains both the plaintiff-victim's and the defendant-tortfeasor's ability to settle on their own preferred terms. This constraint does not seem

---

[38] *Schulte,* 176 Wis. 2d at 634.

[39] *Id.* at 634–35.

*Schulte* did not completely overrule *Blue Cross,* however. "*Blue Cross* still applies when a plaintiff and tortfeasor settle without involving the subrogated insurer and without submitting the issue of the subrogated insurer's rights to the circuit court." *Schulte,* 176 Wis. 2d at 635. In the instant case the Mullers and Society Insurance did submit the issue of the subrogated insurer's (Society Insurance's) rights to the circuit court.

In *Blue Cross* the subrogated insurance company sued the tortfeasor after the plaintiff had settled with the tortfeasor. The narrow holding of *Blue Cross* is that if the subrogated insurance company sues the tortfeasor after the plaintiff has settled with the tortfeasor, the subrogated insurance company need not *plead* that the insured had been made whole.

In the present case the Mullers and Society Insurance were negotiating with the tortfeasor's insurance company *at the same time.*

to offer any benefits that might offset its obvious cost. The majority opinion provides no rationale for its apparent preference for indemnification agreements.

¶ 141. For the foregoing reasons, I dissent.

¶ 142. I am authorized to state that Justices ANN WALSH BRADLEY and LOUIS B. BUTLER, JR. join this opinion.